# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**BORIS ZAVADOVSKY** and

ELENA DVOINIK,

*Plaintiffs,*

v.

**REPUBLIC OF AUSTRIA,**

I-XX UNKNOWN AUSTRIAN PERSONS JOHN DOE(S),

ELKE U. ROLFF,

DALE F. WEBNER,

*Defendants.*



Case: 1:25-cv-01008 JURY DEMAND
Assigned To : Walton, Reggie B.
Assign. Date : 3/27/2025
Description: Pro Se Gen. Civ. (F-DECK)

### COMPLAINT FOR DAMAGES UNDER

**Commercial activity FSIA exception 28 U.S.C. 1605(a)(2); RICO (18 U.S.C. § 1962(c)** (a. Money laundering (18 U.S.C. § 1956); b. Wire fraud (18 U.S.C. § 1343); c. Mail fraud (18 U.S.C. § 1341); d. Obstruction of justice (18 U.S.C. § 1503); e. Extortion (18 U.S.C. § 1951) **; RICO Conspiracy (18 U.S.C. § 1962(d); CONVERSION; DEFAMATION; IIED.**

1

## TABLE OF CONTENTS

Table of Authorities ……………………………………………..…………….. 3

Parties (¶¶1–5) ……………………………………………… 5

Introduction (¶¶6–7) ……………………………………….6

Background Facts  (¶¶8–49)  ……………………………………… 7

Jurisdiction and Venue (¶¶50–51)  …………………………..………………. 20

Jurisdictional Basis Against Republic of Austria (¶¶52–76)  …………………… 21

Preliminary Facts (¶¶77–91)  ………………………………………..… 30

Detailed Factual Allegations (¶¶92–203) ……………………………… 38

Claims for relief (¶¶204–333)  ……………………………………..… 64

**COUNT I – VIOLATION OF RICO (18 U.S.C. § 1962(c))**
against all Defendants (¶¶204–276)……………………………………..…...64

ALLEGATIONS ESTABLISHING
THE EXISTENCE OF A RICO ENTERPRISE(¶¶212–224)……………...………65

**RICO PREDICATE ACTS (¶¶224–276)…………………………………….71**

MONEY LAUNDERING (18 U.S.C. § 1956) – Predicate Act under RICO
(against all Defendants) (¶¶224–230)……………………..……………………71

MAIL FRAUD (18 U.S.C. § 1341) – Predicate Act under RICO
(against all Defendants) (¶¶231–239)………………………………………….76

WIRE FRAUD (18 U.S.C. § 1343) – Predicate Act under RICO
(against All Defendants) (¶¶240–247)………………………………………….80

OBSTRUCTION OF JUSTICE (18 U.S.C. § 1503) – Predicate Act under RICO
(Against All Defendants) (¶¶248–262)…………………..……………………..85

EXTORTION (18 U.S.C. § 1951) – Predicate Act under RICO
(Against All Defendants). (¶¶263–276)…………………..……………………90

**COUNT II– RICO CONSPIRACY (18 U.S.C. § 1962(d))**

(Against Defendants Republic of Austria, Elke Rolff, Dale Webner, and John Doe(s))
(¶¶277–287)..................................................................................................94

**COUNT III– CONVERSION UNDER D.C. COMMON LAW**
(Against Defendants Republic of Austria, Elke Rolff, Dale Webner, and John Doe(s))
(¶¶288-304).................................................................................................99

**COUNT IV – DEFAMATION UNDER D.C. COMMON LAW**
(Against Defendants Republic of Austria, Elke Rolff, Dale Webner, and John Doe(s))
(¶¶305–319)...............................................................................................104

**COUNT V– INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)**
 (Against Defendants Republic of Austria, Elke Rolff, Dale Webner, and John Doe(s))
(¶¶320–333)...............................................................................................109

PRAYER FOR RELIEF...............................................................................113
DEMAND FOR JURY TRIAL.....................................................................116
VERIFICATION.........................................................................................117

## TABLE OF AUTHORITIES

28 U.S.C. § 1603(a)......................................................................................5
28 U.S.C. § 1603 ....................................................................................20,22
§3(1)(1) Austrian ProcG...............................................................................5
§4(8) ProkG (Finanzprokuraturgesetz BGBl 110/2008), .............................46
18 U.S.C. § 1962(c)..................................................................................7,64
18 U.S.C. § 1962(d)..................................................................................7, 94
28 U.S.C. §1605(a)(2).............................................19,20,21,22,23,25,71,115
28 U.S.C. §(a)(5)....................................................................................29,30
28 U.S.C. § 1330(a)....................................................................................20
28 U.S.C. § 1331.........................................................................................20
28 U.S.C. § 1332(a)(2)................................................................................20
28 U.S.C. § 1367.........................................................................................21
28 U.S.C. § 1391(f).....................................................................................21
28 U.S.C. § 1391(b).....................................................................................21
28 U.S.C. §§ 1604.......................................................................................21
22 U.S.C. § 612 et. seq.....................................................................46,72,73,75
18 U.S.C. § 1956.................................................................64,71,72,73,75
18 U.S.C. § 1343.................................................................................70,80,98
18 U.S.C. § 1341.........................................................................64,70,76,98
18 U.S.C. § 1503.................................................................64,70,85,86,89,98
18 U.S.C. § 1951.........................................................................64,70,90,94,98
15 U.S.C. §§ 78dd-1, et seq.................................................................73,75

*Dvoinik v. Rabl*, 22-24226, S.D.Fla. (2024)
*Dvoinik v. Philipp*, 22-11270, M.D.Fla. (2023)
*Dvoinik v. Republic of Austria*, 22-1700, M.D.Fla. (2022).

*Abourezk v. New York Airlines, Inc.*, 895 F.2d 1456 (D.C. Cir. 1990)...........................110

*Ansary v. Central Bank of Curacao and Sint Maarten*, 735 F.Supp.3d 37 (2024)..............22

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683,102
L.Ed.2d 818 (1989)...............................................................................................21

*Boyle v. United States*, 556 U.S. 938, 944 (2009)..................................................66

*Crowley v. N. Am. Telecomm. Ass'n*, 691 A.2d 1169, 1173 (D.C. 1997).......................105

*Crystallex International Corp. v. Venezuela*, 251 F.Supp.3d 758 (2017).........................22

*Davoyan v. Republic of Turkey*, 116 F. Supp. 3d 1084 (2013)....................................23

*Dentons US LLP v. Republic of Guinea,* 410 F.Supp.3d 194 (2019)...........................23,24

*El–Hadad v. United Arab Emirates,* 216 F.3d 29, 35 (D.C. Cir. 2000)............................30

*Embassy of Federal Republic of Nigeria v. Ugwuonye,* 901 F.Supp.2d 136
(2012)..................................................................................................................24

*Friedman v. Government of Abu Dhabi, United Arab Emirates,* 464 F.Supp.3d 52
(2020)...................................................................................................................25

*Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984)............................................110

*Jam v. International Finance Corporation*, 442 F. Supp. 3d 162 (2020)...........................23

*Kensington Intern. Ltd. v. Itoua*, 505 F.3d 147 (2007)..............................................29

*Nnaka v. Federal Republic of Nigeria,* 238 F.Supp.3d 17 (2017)..........................24,28,29,30

*Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)...................................................105

*Pablo Star Ltd. v. Welsh Government,* 378 F.Supp.3d 300 (2019)..................................22

*Salinas v. United States*, 522 U.S. 52, 63-65 (1997)................................................95

*Southway v. Central Bank of Nigeria*, 198 F.3d 1210 (1999).......................................29

*Terenkian v. Republic of Iraq*, 694 F.3d 1122 (2012)............................................22,23

*Washington Gas Light Co. v. Pub. Serv*. Comm'n, 61 A.3d 662, 675–76 (D.C.
2013)..................................................................................................................100

*Youming Jin v. Ministry of State Security*, 475 F. Supp. 2d 54 (D.D.C.
2007)................................................................................................................25,28

*Zavadovsky v. Cheatle, 24-1997, D.D.C* ......................................................*18,19,50,56,62,64,86*

## PARTIES

**1. Plaintiffs ELENA DVOINIK and BORIS ZAVADOVSKY** ("Plaintiffs") are private individuals, spouses and citizens of Florida who reside at 1413 Crescent Hills Dr, Tallahassee, FL, 32303.

**2. Defendant REPUBLIC OF AUSTRIA** is a foreign state within the meaning of the Foreign Sovereign Immunities Act (28 U.S.C. § 1603(a)), represented through its FINANZPROKURATUR under §3(1)(1) Austrian ProcG[1] at Finanzprokuratur Singerstraße 17-19, 1011 Vienna, Austria.

**3. Defendants I-XX Unknown Austrian Persons JOHN DOE(S)** are officials within the Austrian Ministry of Justice and Ministry of the Interior, Finanzprokuratur, Austrian Ministry of Foreign Affairs, Austrian Embassy in Washington D.C. who directed and facilitated the criminal scheme and whose identities will be established during discovery.

**4. Defendant DALE F. WEBNER**, Florida Bar attorney, Bar#: 265241, U.S. citizen, citizen of Florida, resides in Broward County in 2442 Poinciana Ct, Weston, FL, 33327.

---

[1]
https://www.jusline.at/gesetz/prokg/paragraf/3, last visited on March 24, 2025.

**5.Defendant ELKE U: ROLFF (STANKOVIC),** Florida Bar attorney, Bar #: 698636, at least at Rolff Law,P.A., Magnificent Obsessions Co, Diaz, Reus, Rolff and Targ, P.A., SEM Law LLC, Rolff Enterprises Inc., Rutecki and Rolff Holding LLC, Magnificent Creations, Inc. f/k/a Fabulous Assets Co., holder of Individual Floridian Quota alcoholic beverages licensee since 2017, Trusted lawyer and legal adviser of the Republic of Austria in the 50 United States of America since 2015, attorney at law in Swiss, a citizen of Florida, resides in Miami-Dade County, 8818 Harding, Ave Surfside, FL 33154.

## INTRODUCTION

**6.** This case originates from the actions of an International RICO Enterprise involving **corrupt employees of the Austrian Embassy in Washington D.C., corrupt Austrian officials, and U.S. attorneys.** These individuals engaged in activities within the United States in attempts to create false pretenses on property that benefitted the Republic of Austria. This misconduct directly relates to the property of the Plaintiffs, which was previously stolen in Austria. The defendants committed multiple acts of defamation, obstruction of justice, and intimidation and engaged in money laundering, as well as several violations of the Foreign Agents Registration Act and the Foreign Corrupt Practices Act.

**7.** The Plaintiffs claiming violations of RICO (18 U.S.C. § 1962(c)), RICO

Conspiracy (18 U.S.C. § 1962(d)), Conversion of the Plaintiffs' valuable property,

Defamation, and Intentional Infliction of Emotional Distress (IIED) through

misleading, threats, intimidation, and defamation, which cause emotional harm.

## BACKGROUND FACTS

**8.** Dr. Boris Zavadovsky is a retired U.S. emergency room physician who

worked for 35 years under contract with the U.S. Army, including work from 1994

until 2017 in the U.S. hospital at the U.S. military airbase Ramstein in Landstuhl,

Germany.[2]

**9.** He and his wife, Elena Dvoinik, became targets of the International

Racketeering Influenced Corrupt Organization after witnessing various grill parties

in the spring and summer of 2020 at Zuckerhut-Siedlung 1, 2640 Gloggnitz,

Austria, conducted by the closest neighbor of their former vacation house at

Zuckerhut-Siedlung 3A, 2640 Gloggnitz, Austria, Mr. Florian Stermann. (See

EXHIBIT 1).

---

[2]

https://landstuhl.tricare.mil/About-Us/Directory, last visited on March 24, 2025.

**10.** Florian Stermann is an alter ego in orchestrating connections between the Russian mafia, Russian intelligence services, and corrupt Austrian politicians and businessmen.

**11.** He is a notable figure in Austrian-Russian relations, having served as the chairman of the **Austrian-Russian Friendship Society**. In this capacity, he facilitated connections between Austrian political entities, such as the **Freedom Party of Austria (FPÖ),** and Russian counterparts. Mr. Stermann played a pivotal role in introducing **Wirecard (which resulted in a $2 billion damages fraud)**, the German payment processing company, to the Russian market. His efforts led to negotiations with Russian telecommunications firms, including **Megafon**, for projects like providing prepaid credit cards and implementing payment services for the Moscow Metro. Although these ventures ultimately did not materialize, they underscore Stermann's significant influence in fostering Austrian-Russian business collaborations.

**12.** Beyond his business endeavors, Stermann maintained close ties with key Austrian political figures. He collaborated with **Johann Gudenus**, a prominent FPÖ member, to disseminate information aimed at undermining Austria's intelligence agency, the **BVT**. This collaboration involved using the Friendship Society as a platform to promote narratives that aligned with Russian interests,

reflecting Stermann's deep involvement in political maneuverings that intersected with international espionage activities.

**13.** Stermann's association with Wirecard's former COO, **Jan Marsalek**, further highlights his central role in these complex networks. Marsalek, implicated in the Wirecard scandal and alleged to have connections with Russian intelligence, utilized Stermann's network to advance his objectives. This relationship underscores the intricate web of political and business affiliations that Stermann navigated, positioning him as a key intermediary in Austrian-Russian relations.[3]

---

[3]

https://www.politico.eu/article/vladimir-putin-austria-spy-service-bvt-government-intelligence-wirecard-jan-marsalek-freedom-party/
https://threadreaderapp.com/thread/1283059691615145985.html
https://www.dailysabah.com/world/europe/austria-diplomat-accused-of-novichok-document-leak-spying?fbclid=IwY2xjawI5rSNleHRuA2FlbQIxMQABHVO7aDbaofYAK6Bi-IKqUvyEsE6xVM79RdmoWbfNvcgtBZhBoWIYX6E7XQ_aem_kerEn3niiLgJeJxQuIh3gPw
https://www.politico.eu/article/strasser-sentenced-to-four-years-in-prison/
https://esthinktank.com/2016/01/09/ernst-strasser-and-the-cash-for-laws-scandal-an-austrian-tale-of-political-corruption/
https://www.profil.at/wirtschaft/liebesgruesse-nach-moskau-oesterreichisch-russische-freundschaftsgesellschaft/401936653
https://euromaidanpress.com/2021/02/05/ngo-institute-for-security-policy-austrian-ministry-of-defense-and-valdai-club-case-study-on-russian-influence-in-central-europe/
https://kurier.at/chronik/oesterreich/florian-stermann-jan-marsalek-johann-gudenus-egisto-ott-spionageverdacht/402864644
https://www.krone.at/3325056
https://www.tageins.at/was-die-fpoe-mit-der-spionaffare-egisto-ott-zu-tun-hat-jan-marsalek-antifaschistinnen/
https://orf.at/stories/3173179/
https://www.profil.at/oesterreich/wirecard-auftraege-fuer-strassers-ex-kabinettschef/401173144
https://www.sn.at/politik/innenpolitik/ex-kabinettschef-von-strasser-arbeitete-fuer-wirecard-99105583
https://kurier.at/chronik/oesterreich/stermann-ott-marsalek-spionageaffaere-bvt/402862070
https://www.news.at/news/benko-marsaleks-moskau
https://www.newyorker.com/magazine/2023/03/06/how-the-biggest-fraud-in-german-history-unravelled
https://www.krone.at/3328714
https://investigatebel.org/en/investigations/vorobej-i-ego-druzya-v-evropejskih-elitah-kakie-bogatstva-semya-koshelka-lukashenko-sberegla-ot-sankcij-v-es

**14.** Mr. Stermann, along with his accomplice Mr. Gudenus, was responsible for

all bribes to Austrian corrupt politicians. He acted as a middleman and was directly

---

https://www.derstandard.at/story/3000000209638/manager-spion-priester-das-unheimliche-doppelleben-des-jan-marsalek

https://www.derstandard.at/story/3000000215219/marsalek-praesentierte-in-kickls-innenministerium-ideen-zu-migration

https://www.heute.at/s/der-spion-der-die-politiker-kontrollieren-wollte-120032076

https://theins.ru/en/politics/269612

https://sceeus.se/en/publications/ending-the-schwarzer-tango-with-moscow-the-freedom-party-of-austria-and-the-embrace-of-neutralism/

https://www.thedial.world/articles/news/issue-16/jan-marsalek-wirecard-russian-spy

https://www.spiegel.de/international/business/jan-marsalek-an-agent-for-russia-the-double-life-of-the-former-wirecard-executive-a-7e667c03-6690-41e6-92ad-583d94ba97e0

https://www.profil.at/investigativ/marsalek-wollte-dass-die-schwarz-blaue-koalition-funktioniert/402852727

https://intelnews.org/2024/09/09/01-3363/

https://www.euronews.com/2024/04/09/arrest-of-ex-intelligence-officer-reveals-new-evidence-of-russian-infiltration-across-euro

https://www.yahoo.com/news/espionage-scandal-rocks-austria-laying-120142176.html

https://www.wsj.com/world/a-den-of-spies-vienna-emerges-as-hub-for-russian-espionage-9dda8b4d

https://www.lemonde.fr/en/international/article/2024/04/12/austria-rocked-by-massive-russian-spying-scandal_6668207_4.html

https://theins.ru/en/news/270392

https://theins.ru/en/news/265371

https://www.washingtonpost.com/national-security/2022/07/05/austria-russia-infuence/

https://www.profil.at/investigativ/ott-prozess-spielte-alpha-77-eine-schluesselrolle/402989745

https://www.bbc.com/news/world-europe-68833834

https://www.washingtontimes.com/news/2024/apr/1/austria-says-it-must-deter-russia-infiltration-aft/

https://www.neue.at/allgemein/2024/04/01/ott-soll-systematisch-russischen-geheimdienst-versorgt-haben.neue

https://www.profil.at/oesterreich/ott-prozess-jenewein-auslieferung-vergessen/402972605

https://www.heute.at/s/mit-allem-rechnen-spionage-alarm-um-nationalratswahl-120032568

https://zackzack.at/2024/03/04/randnotizen-rueckwaerts-in-die-neuen-zeiten

https://kurier.at/politik/inland/bvt-spionage-russland-marsalek-strache-gudenus-spionage/402863051

https://www.semiosis.at/2019/05/16/in-bester-russischer-gesellschaft-die-oevp-liebe-zur-macht-und-ihre-fails-teil-3/

https://orf.at/stories/3173363/

https://www.kleinezeitung.at/politik/innenpolitik/5838911/WirecardSkandal_FPOe-ortet-schwarzen-Faden-zur-OeVP

https://www.parlament.gv.at/dokument/XXVII/KOMM/269/fnameorig_990144.html?utm_source=chatgpt.com

https://apnews.com/article/austria-spying-scandal-russia-ott-marsalek-wirecard-8921f3ce95b30646ee1952bf8949a43f

https://www.dagens.com/news/austria-takes-bold-steps-to-combat-international-espionage.
last visited on March 23, 2024.

implicated in the WIRECARD $2 billion fraud scheme and Marsalek's subsequent escape to Russia.

**15.** Mr. Florian Stermann and his frequent guest, Mr. Johann Gudenus, expressed dissatisfaction with Mr. Zavadovsky's neighborhood and alleged that Mr. Zavadovsky "spied on them and their guests" (notable Austrian and Russian politicians and businessmen).

**16.** Mr. Stermann was dissatisfied with the fact that the Plaintiffs understood Russian and German languages he spoke to his influential guests.

**17.** Also, Dr. Zavadovsky's connection to a U.S. military air base in Ramstein attracted their attention and prompted RICO criminal activities targeting Mr.Zavadovsky and his wife.

**18.** In June 2020, Jan Marsalek escaped with the assistance of corrupt Austrian intelligence orchestrated by Gudenos and Stermann co-conspirator Mr. Martin Weiss from the Bad Vöslau airport, which is situated 15 miles from Gloggnitz.[4]

---

[4]
https://www.lemonde.fr/en/international/article/2024/03/08/jan-marsalek-from-wirecard-fraudster-to-spy-for-russia_6598993_4.html?, last visited on March 24, 2025.
https://www.telegraph.co.uk/news/2025/03/07/marsalek_russian-spymaster-wirecard/, last visited on March 24, 2025.
https://www.bloomberg.com/news/articles/2021-01-25/as-wirecard-collapsed-key-player-fled-by-private-jet-to-belarus, last visited on March 24, 2025.
https://www.ft.com/content/155534db-8e43-4229-8afd-a0af8da4bd4b, last visited on March 24, 2025.

**19.** Mr. Florian Stermann was interrogated in the Austrian Parliament[5] about his connections with Mr. Marsalek and Wirecard, but the issue about Mr. Stermann 's and Mr. Gudenus's involvement in Marsalek's escape was not investigated.

**20.** Although the evidence known to many of Mr. Stermann's neighbors, including Plaintiffs, and multiple reports, he and his -wife were never investigated in connection with the Austrian Ibiza scandal[6].

**21.** Mr. Stermann handled "the problems" through his numerous connections, including connections of his business partner, former Austrian Ministry of Interior Mr. Ernst Strasser, who was sentenced for bribes in the European Parliament[7] but remained the influencing force in the Austrian Ministry of Interior. The police declined to investigate.

**22.** After fleeing to Russia, Mr. Marsalek remotely orchestrated espionage activities and monitored journalists and personnel from U.S. military bases in Europe through a network of Bulgarian citizens and residents. In the summer of 2021, Marsalek coordinated surveillance operations on investigative journalist

---

[5] https://www.parlament.gv.at/dokument/XXVII/J/19198/fnameorig_1644819.html, last visited on March 24, 2025.
[6] https://www.reuters.com/article/world/strasser-jailed-for-bribery-in-european-parliament-sting-idUSBRE90D0TR/, last visited on March 24, 2025.
https://www.france24.com/en/20190829-the-fallout-from-austria-s-ibiza-gate-scandal, last visited on March 24, 2025.
https://en.wikipedia.org/wiki/Ibiza_affair, last visited on March 24, 2025.
https://www.theguardian.com/world/2019/may/20/austria-ibiza-scandal-sting-operation-what-happened-why-does-it-matter, last visited on March 24, 2025.
https://www.krone.at/3330486, last visited March 24, 2025.
[7]

Christo Grozev in Vienna. Bulgarian nationals Gabrova, Ivanchev, and Ivanova
(convicted in March 2025 in London) carried out the surveillance, which was
managed by Marsalek's agent, Russev (arrested in the UK). [8]

---

[8]
    https://www.thetimes.com/uk/crime/article/spies-background-8svp0mr0c?utm_source=chatgpt.com&region=global
    https://www.wsj.com/world/europe/russia-bulgaria-spy-ring-0d12e742?utm_source=chatgpt.com
    https://www.ft.com/content/d91d6ffc-28ef-4abf-9d55-f48bce9d32f0?utm_source=chatgpt.com
    https://www.dailymail.co.uk/news/article-14455421/bed-hopping-Bulgarian-spy-ring-secrets-russia.html
    https://www.theguardian.com/world/2025/mar/07/three-bulgarian-nationals-found-guilty-spying-russia-uk
    https://www.bbc.com/news/articles/cx2gx52xqqpo
    https://www.reuters.com/world/europe/three-bulgarians-convicted-spying-russia-after-uk-trial-2025-03-07/
    https://news.sky.com/story/three-people-guilty-of-spying-for-russia-from-seaside-guesthouse-13316246
    https://www.the-independent.com/news/uk/crime/uk-spy-ring-bulgaria-russia-b2699461.html
    https://www.the-independent.com/news/uk/home-news/russia-spy-london-honeytrap-journalist-b2657338.html
    https://www.reuters.com/world/europe/suspected-russian-spies-targeted-journalist-with-facebook-honey-trap-uk-court-2024-12-02/
    https://www.krone.at/3720353?utm_source=chatgpt.com
    https://info3.com/europe/214690/text/short/austria-court-acquits-exspy-with-farright-links
    https://www.theguardian.com/film/2025/mar/13/antidote-review-gripping-study-of-dissidents-and-whistleblowers-in-putins-crosshairs?utm_source=chatgpt.com
    https://odessa-journal.com/public/christo-grozev-left-austria-because-of-a-threat-from-russian-special-services#google_vignette
    https://www.theguardian.com/world/2025/mar/08/revealed-second-kremlin-spy-ring-targeting-russian-dissidents-discovered-in-uk?utm_source=chatgpt.com
    https://www.youtube.com/watch?v=Z0pxQNUEFj1
    https://www.lemonde.fr/en/international/article/2024/04/12/austria-rocked-by-massive-russian-spying-scandal_6668207_4.html
    https://www.barrons.com/news/spy-arrest-puts-cold-war-spotlight-back-on-vienna-78c1d250
    https://www.theguardian.com/world/2015/feb/24/kazakh-leaders-ex-son-in-law-rakhat-aliyev-found-dead-in-austrian-jail
    https://www.rferl.org/a/kazakhstan-aliyev-austria-murder-probe-nazarbaev/28314088.html
    https://www.europeaninterest.eu/austrian-justice-minister-alma-zadic-said-she-seeks-to-tighten-espionage-law/
    https://www.bloomberg.com/news/articles/2024-04-04/europe-s-spy-capital-weighs-crackdown-on-intelligence-industry
    https://greydynamics.com/vienna-a-city-of-spies-a-history-of-espionage/
    https://www.yahoo.com/news/austrian-minister-aims-tighten-espionage-081936669.html
    https://www.yahoo.com/news/russian-spymaster-planned-over-secret-195722816.html
    https://www.telegraph.co.uk/news/2025/03/11/russia-spy-jan-marsalek-plan-take-over-austria-intelligence/
    https://www.derstandard.de/story/3000000215057/egisto-ott-die-jagd-nach-einem-russischen-ex-agenten-und-ein-suspendierter-staatsschuetzer
    https://zackzack.at/2021/12/28/im-osten-geht-die-sonne-auf-putins-freunde-in-st-poelten-und-wien
    https://www.cps.gov.uk/cps/news/bulgarian-trio-convicted-conspiring-spy-russia?utm_source=chatgpt.com,
    last visited on March 24, 2025.

**23.** One of Marsalek's Bulgarian agents, Mr. Alexey Chuprikov, a Russian citizen residing in Bulgaria, was implemented directly in the Plaintiff's vocation's house in Gloggnitz.

**24.** Earlier, in December 2020, following Ms. Dvoinik's Facebook post (where she sought a person to assist with moving personal property to a shipping company for further transfer from Austria to Florida in exchange for free housing in the plaintiffs' vacation home—a luxury villa in the Vienna Alps—while the owners reside in Florida), Mr. Alexey Chuprikov, a Russian citizen living in Bulgaria, responded.

**25.** In spring 2021, Alexey Chuprikov lived in the Plaintiffs' house in Gloggnitz alone while Plaintiffs were in Florida. He gathered information for Marsalek in Vienna and assisted Mr. Marsalek in exchanging information with Mr. Florian Stermann, who was nearby in the next house.

**26.** As the Plaintiffs later discovered and reported to Austrian law enforcement, Mr. Chuprikov had connections to the Russian FSB[9] and to persons who was involved in war crimes in the Donbas area previously. The Republic of Austria refused to conduct an investigation.

---

[9]

https://en.wikipedia.org/wiki/Federal_Security_Service#:~:text=The%20Federal%20Security%20Service%20of,Lubyanka%20Building, last visited on March 24, 2025.

**27.** After the Plaintiffs returned from Florida to Gloggnitz in late May 2021, Mr. Chuprikov, under the influence of alcohol, claimed to be "a Russian intelligence officer defending his motherland, Russia" and demanded 1,000 EUROS from Dr. Zavadovsky in exchange for Chuprikov's silence about Dr. Zavadovsky connection with U.S. Army and his work for U.S. government.

**28.** The Plaintiffs did not take his words seriously.

**29.** Mr. Chuprikov departed to Bulgaria soon and sent an email demanding 2000 EUROS "for silence", which the Plaintiffs ignored.

**30.** Plaintiffs left Austria on June 28, 2021, and departed to Florida.

**31.** On June 15, 2021, Mr. Chuprikov sent the Austrian police an email falsely denouncing the Plaintiffs. He falsely stated that he allegedly witnessed during his stay in Gloggnitz how the Plaintiffs produced false passports and certificates. He also stated that the Plaintiffs were going to depart for Florida on June 28, 2021.

**32.** On July 12, 2021, police officer Mario Rabl, former police officer Susanne Hoflinger, her husband IT specialist Thomas Hofflinger, and unidentified individuals conducted a search of the plaintiffs' home at Zuckerhut-Siedlung 3A, 2640 Gloggnitz, and unlawfully seized all of the plaintiffs' personal property without warrant.

**33.** Elena Dvoinik and Boris Zavadovsky ("Plaintiffs") are the lawful owners of personal property at issue stolen from their former house at Zuckerhut-Siedlung, 3 A Gloggnitz, Austria, during the unlawful police raid.

**34.** The property includes the **Vladimir Libson's**[10] (Mr. Zavadovsky's father, a prominent Jewish architect) archive; antique coins; Ms. Dvoinik's business archive; Mr. Zavadovsky's tax-relevant documents for 40 years; Mr. Zavadovsky's business archive; and Mr. Zavadovsky's educational documents and certificates of CMR (continuing medical education) for 40 years, Plaintiffs' medical records.

**35.** The Libson's archive and coins have market value around $5.600.000.

**36.** After the property was unlawfully seized by RICO members - police officers, and the husband of one of the police officers without a warrant, their co-conspirator, a Vienna attorney Mr. Peter Philipp, extorted bribe in favor of

---

[10] https://find.library.upenn.edu/catalog/992293573503681?hld_id=22357620300003681, last visited on March 23, 2025.
https://web.nypl.org/research/research-catalog/bib/b14301237, last visited on March 23, 2025.

https://searchworks.stanford.edu/catalog?q=%22Libson%2C+V.+I%CD%A1A.+%28Vladimir+I%CD%A1Akovlev ich%29%22&search_field=search_author, last visited on March 23, 2025.

https://ru.wikipedia.org/wiki/%D0%9B%D0%B8%D0%B1%D1%81%D0%BE%D0%BD,_%D0%92%D0%BB%D 0%B0%D0%B4%D0%B8%D0%BC%D0%B8%D1%80_%D0%AF%D0%BA%D0%BE%D0%B2%D0%BB%D0 %B5%D0%B2%D0%B8%D1%87, last visited on March 23, 2025.

public prosecutor Ms. Gunda Ebhart for the return of the Plaintiffs' property and threatened with reprisals from Austrian officials.

**37.** Plaintiffs refused to pay any bribes, reported crimes to law enforcement, and filed multiple complaints with various Austrian authorities, claiming the theft of property, the theft of Mr. Zavadovsky's U.S. military documents, the hacking of his U.S. military email, and the potential leaking of U.S. classified information. No criminal investigations were initiated; the defendant, the Republic of Austria, suppressed all complaints and refused to communicate with Mr. Zavadovsky and his wife.

**38.** Austrian police unlawfully withheld the Plaintiffs' original documents, including passports, certificates of origin, and marriage certificates, unlawfully taken from the house, for ten months, falsely claiming a need to withhold them due to ongoing criminal investigations into the Plaintiffs' allegedly false identities until it was partially returned to the Plaintiffs daughter in April 2022.

**39.** The Defendant, the Republic of Austria, refused to interrogate the Plaintiffs and denied them the opportunity to bring witnesses, provide evidence, prove the truth, and participate in criminal investigations, as is granted by the Austrian Constitution and European Convention of Human Rights.

**40.** The Defendant, the Republic of Austria, harassed and intimidated the Plaintiffs through the actions of its public prosecutor, Ms. Gunda Ebhart (who was involved in an extortion scheme), as well as Mario Rabl and Susanne Hoflinger.

**41.** In October and November 2021, Mario Rabl and Susanne Hoflinger, contacted the U.S. Secret Services and made false, defamatory statements against the Plaintiffs, falsely accusing Plaintiffs in tax evasion and insurance fraud. See the related case *Zavadovsky v. Cheatle,* 24-1997, D.D.C.

**42.** They also contacted German and Russian law enforcement in the Fall of 2021, making false, defamatory statements against the Plaintiffs.

**43.** After all formal legal grounds for the Defendant Republic of Austria to withhold the property were terminated on July 8, 2022, and after the Plaintiffs repeated their demands for its return, Austria refused to return. It refused to investigate the matter or return the stolen items and refuse to respond at all.

**44.** The defendant, Republic of Austria, through the Austrian Embassy in Washington, D.C., hired a private attorney in Florida, Ms. Elke Rolff (who has been unlawfully acting since 2015 in violation of criminal FARA provisions as an Austrian foreign agent in the U.S. and engages in unlawful money

laundering activities) to disseminate false information, threaten the plaintiffs, and interfere with the plaintiffs' litigations against private persons.

**45.** The Defendant, the Republic of Austria, used misappropriated government funds to pay for these unlawful activities, which constitute commercial activity under the FSIA 28 U.S.C. §1605(a)(2).

**46.** Defendants Rolff, Webner, and John Doe(s) actively participated in an Austrian money laundering scheme involving the whitewashing of embezzled Austrian budget funds, using Plaintiffs' U.S. litigations as a ground for receiving money for fictitious legal services that were never performed. They also coordinated and conducted an effort to obstruct justice, deceive, intimidate, and defame Plaintiffs in Florida and Washington D.C.

**47.** The Republic of Austria and John Doe(s) defendants organized the malicious prosecution of the Plaintiffs in Austria and placed them on the Austrian wanted list due to being "suspects in a $988 insurance fraud involving a Miami optometrist in 2019." See the related case *Zavadovsky v. Cheatle*. The John Doe(s) defendant refused to interrogate Plaintiffs' witnesses, suppressed obvious and numerous exculpatory evidence, and attempted to fabricate inculpatory evidence through their agents, Ms. Rolff and Mr. Webner, to justify the false pretenses regarding the plaintiffs' $6,000,000 property and to avoid

liability. Mr. Webner threatened Plaintiffs with various Austrian reprisals, humiliated, intimidated and harassed Plaintiffs. He also made multiple defamatory statements to U.S. authorities, falsely claiming that Plaintiffs are criminals and undergoing multiple criminal investigations in Austria.

**48.** John Doe(s) and the other defendants used the plaintiffs' U.S. civil litigations as a fictitious basis to steal money from the Austrian budget and launder it .

**49.** As a result, the Plaintiffs suffered harm to their property and persons, which is likely to be redressed in the event of a favorable decision.

## JURISDICTION AND VENUE

**50.** This Court has jurisdiction over this action pursuant to:

**28 U.S.C. § 1330(a)** – Claims against a foreign sovereign.

- **28 U.S.C. §§ 1605(3), 1605(a)(2)** – The commercial activity exception to foreign sovereign immunity.
- **18 U.S.C. §§ 1964(c) and 1964(d)** – Civil RICO jurisdiction, including conspiracy.
- **28 U.S.C. § 1331** – Federal question jurisdiction.

o **28 U.S.C. § 1332(a)(2)** (diversity jurisdiction upon non-Floridian individuals over related state law claims);

o **28 U.S.C. § 1367** (supplemental jurisdiction upon Floridian defendants over related state law claims);

**51.** Venue is proper in this Court under **28 U.S.C. § 1391(f)** because the Austrian government and the Austrian Embassy in Washington, D.C., carried out relevant commercial activity in this district, including hiring Ms. Rolff and Mr. Webner to launder money and to intimidate and obstruct Plaintiffs' legal claims, to conduct black PR campaign against Plaintiffs, and under **28 U.S.C. § 1391(b)** because a substantial part of the events giving rise to this action occurred within this judicial district.

## JURISDICTIONAL BASIS AGAINST REPUBLIC OF AUSTRIA

**52.** The exclusive "basis for obtaining jurisdiction over a foreign state in our courts" is set forth in the FSIA. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989); *see* 28 U.S.C. §§ 1604, 1330(a).

### This Court has jurisdiction over the Republic of Austria under commercial exception 28 U.S.C. §§ 1605(a)(2).

**53.** Under 28 U.S.C.A. § 1605(a)(2), the commercial activity exception to the Foreign Sovereign Immunities Act (FSIA) applies in three circumstances: (1) when the action is based upon a commercial activity carried on in the United States by the foreign state; (2) when the action is based upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or (3) when the action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States (*Ansary v. Central Bank of Curacao and Sint Maarten*, 735 F.Supp.3d 37 (2024)), (28 U.S.C.A. § 1605).

**54.** The term "commercial activity" is defined as either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity is determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose (*Crystallex International Corp. v. Venezuela*, 251 F.Supp.3d 758 (2017)), (28 U.S.C.A. § ). This means that the focus is on whether the foreign state acts in the manner of a private player within the market, engaging in trade, traffic, or commerce, rather than exercising powers peculiar to sovereigns (*Terenkian v. Republic of Iraq*, 694 F.3d 1122 (2012))[, (*Pablo Star Ltd. v. Welsh Government*, 378 F.Supp.3d 300 (2019)).

**55.** For the commercial activity to be deemed "carried on in the United States," it must have significant contact with the United States (*Crystallex International Corp. v. Venezuela,* 251 F. Supp. 3d 758 (2017)), (*Jam v. International Finance Corporation*, 442 F. Supp. 3d 162 (2020)). Additionally, there must be a connection between the defendant's commercial activity in the United States and the plaintiff's grievance for the commercial activity exception to apply (*Terenkian v. Republic of Iraq*, 694 F.3d 1122 (2012)), (*Davoyan v. Republic of Turkey*, 116 F. Supp. 3d 1084 (2013)).

**56.** In summary, the commercial activity exception under <u>28 U.S.C. § 1605</u>(a)(2) applies when a foreign state engages in activities that a private party would engage in within the market, and there is a substantial connection or direct effect in the United States related to the plaintiff's claim.

**57.** To establish jurisdiction over the Republic of Austria under the commercial activity exception of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605(a)(2), the Plaintiffs must demonstrate that the conduct of the Austrian government and its agents constitutes "commercial activity" rather than sovereign or governmental conduct. The relevant precedent cases establish the legal framework for applying this exception:

**58.** In *Dentons US LLP v. Republic of Guinea,* the court held that contracting for the provision of legal services constitutes "commercial activity" under the FSIA because retaining an attorney is the type of activity by which private parties engage in commerce (*Dentons US LLP v. Republic of Guinea,* 410 F.Supp.3d 194 (2019)).

**59.** The court emphasized that it does not matter why the foreign government retained counsel or whether the foreign government's ultimate objective was to further a sovereign interest; what matters is whether the activity is the type by which a private party engages in commerce (*Dentons US LLP v. Republic of Guinea*, 410 F.Supp.3d 194 (2019)).

**60.** Similarly, in *Nnaka v. Federal Republic of Nigeria*, the court agreed that retaining an attorney is the type of activity by which private parties engage in commerce, thus constituting "commercial activity" under the FSIA (*Nnaka v. Federal Republic of Nigeria,* 238 F.Supp.3d 17 (2017)). The court rejected the argument that the purpose of the retainer (to repatriate proceeds of official corruption) made it a sovereign activity, emphasizing that the proper question is the nature of the activity, not its purpose (*Nnaka v. Federal Republic of Nigeria,* 238 F.Supp.3d 17 (2017)).

**61.** In *Embassy of Federal Republic of Nigeria v. Ugwuonye,* the court found that contracts for legal services constitute commercial activity when the claim

against the foreign state arises from the state's failure to pay legal fees (*Embassy of Federal Republic of Nigeria v. Ugwuonye,* 901 F.Supp.2d 136 (2012)). This case further supports the notion that legal services are considered commercial activity under the FSIA.

**62.** Additionally*, Friedman v. Government of Abu Dhabi, United Arab Emirates* reinforced that retaining legal services is a commercial activity, noting that there is nothing distinctively sovereign about the nature of this activity, even if its ultimate purpose was sovereign (*Friedman v. Government of Abu Dhabi, United Arab Emirates*, 464 F.Supp.3d 52 (2020)).

**63.** *Youming Jin v. Ministry of State Security*, 475 F. Supp. 2d 54 (D.D.C. 2007) emphasized that the nature of the activity—not its purpose—determines whether the commercial activity exception applies.

**64.** These cases collectively establish that hiring an attorney, regardless of the underlying purpose, is considered a commercial activity under the FSIA, thus falling within the commercial activity exception to foreign sovereign immunity under 28 U.S.C.A. § 1605(a)(2).

**Austria's Conduct as Commercial Activity**

65. In this case, Austria's conduct satisfies the "commercial activity" test under FSIA because:

- **The operating institution of so-called "Trusted lawyers" is the regular course of commercial conduct.**

- **Hiring U.S.-based Attorneys for Legal and other Services**

  Austria hired Ms. Rolff, a Florida-based attorney, to perform legal and foreign agents' services benefiting Austria and handle the Plaintiffs' legal matters. Hiring a private attorney is a commercial activity because private entities engage in similar transactions.

- **Misappropriation of Government Funds to Pay Private Attorneys**

  Austria used government funds to pay for Ms. Rolff and Mr. Webner's services, including issuing false invoices for services not performed. This misuse of funds amounts to fraudulent business activity, which qualifies as commercial activity.

- **Defamation and Harassment Against Plaintiffs**

  Austria's efforts to defame and harass the Plaintiffs through Ms. Rolff and Mr. Webner, as well as the orchestration of false criminal investigations and threats of deportation, were part of a scheme aimed at securing a commercial advantage by retaining Plaintiffs' stolen property.

- **Use of Embassy Personnel and Resources for Commercial Gain**

  Austria's Embassy in Washington, D.C., facilitated payments for fictitious services, creating a financial laundering scheme that resembles business or financial activity rather than sovereign conduct.

- **Austria's Retention of Rolff and Webner Constitutes Commercial Activity**

- The Republic of Austria retained Ms. Rolff to provide legal representation for **private individuals** (unknown Austrian officials).

- According to the Austrian Embassy's official guidelines, the Republic of Austria **does not provide financial aid for legal services of its citizens abroad**.

- The Austrian Embassy's website explicitly states that "legal representation by Austrian diplomatic representations is NOT possible." (See official webpage of Austrian Embassy bmeia.gv.at, last visited on March 24, 2025.)

- Austria's **transmission of false information** to the U.S. courts, including the fabricated affidavits and letters filed in Florida federal courts, caused a **direct effect** in the United States—establishing subject-matter jurisdiction under FSIA.

**66.** Therefore, Austria's engagement of Ms. Rolff to represent private individuals deviates from standard diplomatic assistance and aligns more closely with commercial activities typically undertaken by private entities.

**67.** Since retaining private counsel for litigation is an act that private parties routinely engage in, Austria's conduct qualifies as commercial activity under FSIA.

**Direct Effect in the United States**

**68.** Under FSIA, the "direct effect" requirement means that the foreign state's action must have a substantial and foreseeable impact in the U.S.

- Plaintiffs are U.S. citizens and residents of Florida.
- Austria's defamatory statements and threats of prosecution harmed the Plaintiffs' reputation and financial standing in the U.S.
- Austria's use of government funds to pay U.S. attorneys for fictitious legal services directly affected the Plaintiffs' legal rights and economic interests in Florida and Washington, D.C.

**69.** In *Nnaka*, the court held that communications between Nigeria and the U.S. government that directly affected the plaintiff's business and legal status in the U.S. satisfied the direct effect requirement.

**70.** In *Youming Jin*, the court found that the interference with a U.S. contractual relationship satisfied the "direct effect" requirement under FSIA.

**71.** In *Southway*, the court ruled that acts committed overseas but resulting in direct financial harm in the U.S. (loss of property or business opportunity) satisfied the direct effect requirement.

**Illegal Conduct Does Not Eliminate the Commercial Activity Exception**

**72.** Even though Austria's conduct involved extortion, defamation, and money laundering, these illegal acts do not negate the commercial nature of the activity.

**73.** In *Southway v. Central Bank of Nigeria*, the court affirmed that civil RICO claims could proceed against a foreign state if the conduct involved commercial activity, even if the acts were illegal (*Southway v. Central Bank of Nigeria*, 198 F.3d 1210 (1999)). Similarly, in *Kensington Intern. Ltd. v. Itoua,* the court discussed that the commercial activity exception applies if any element of the plaintiff's claim is established by the commercial activity in the United States (*Kensington Intern. Ltd. v. Itoua*, 505 F.3d 147 (2007)

**74.** *Nnaka* affirmed that fraud, extortion, and money laundering linked to business contracts still qualify as commercial activity.

**28 U.S.C. § 1605 (a)(5) exception from FSIA exception Does Not bars claims for Defamation, Fraud and Malicious Prosecution.**

**75.** The Court found in *Nnaka*:

> The Court need not consider whether Nnaka's suit against Nigeria also falls within the noncommercial tort exception to FSIA immunity. The non-commercial tort exception removes foreign-sovereign immunity for cases, "not otherwise encompassed" by the commercial activity exception, "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state." 28 U.S.C. § 1605(a)(5). Several of the claims that Nnaka has brought here—abuse of process, libel, and misrepresentation—are expressly excluded from the non-commercial tort exception's ambit. See id. § 1605(a)(5)(B). But that is of little consequence. Because Nnaka's suit against Nigeria is encompassed by the commercial activity exception, the non-commercial tort exception does not apply. And even though several of Nnaka's claims would be barred under the non-commercial tort exception, under D.C. Circuit precedent that "do[es] not limit" the claims that he can pursue through the commercial activity exception. See El–Hadad v. United Arab Emirates, 216 F.3d 29, 35 (D.C.                                    Cir.                                    2000).

*Nnaka v. Fed. Republic of Nigeria,* 238 F. Supp. 3d 17, 30 (D.D.C. 2017), aff'd, 756 F. App'x 16 (D.C. Cir. 2019)

**76.** As in *NNaka*, the Plaintiffs in the present case have valid claims against Austria for defamation under the FSIA commercial exception.

## PRELIMINARY FACTS

**77.** Austria, particularly its capital, Vienna, has long been recognized as a central hub for international espionage. The city's strategic location, historical neutrality, and hosting of numerous international organizations have made it an attractive base for intelligence operations. The Wall Street Journal has highlighted Vienna's emergence as a center for Russian espionage activities, noting that the city serves as a base for clandestine operations, including financing and logistical support for various missions across Europe.

**78.** The presence of a significant number of Russian diplomats and state employees in Vienna has raised concerns among Western intelligence agencies. Reports indicate that out of over 500 Russian state employees in Austria, more than half are diplomats, with estimates suggesting that a substantial portion may be involved in intelligence activities.

**79.** Austria's legal framework and political stance contribute to its role as an espionage hub. The country's neutrality and lenient espionage laws have created an environment where foreign intelligence services can operate with relative ease. This situation has led to Austria being described as "Russia's tunnel into the heart of Europe," highlighting concerns about the extent of foreign intelligence activities within its borders.

**80.** Recent incidents underscore the challenges Austria faces in addressing espionage activities. For instance, Austrian authorities uncovered a Russian-directed campaign to spread disinformation about Ukraine, involving a Bulgarian national linked to Jan Marsalek, the fugitive former COO of Wirecard. This operation aimed to influence public opinion in German-speaking countries, particularly Austria, by disseminating misleading information about the Ukrainian government.

**81.** These developments highlight the complex landscape of espionage in Austria and the ongoing efforts required to address foreign intelligence operations within the country.[11]

**82.** The Republic of Austria has faced numerous allegations and scandals involving corruption at the highest levels of government, business, and law enforcement. Over the past decade, several high-profile cases have exposed deep-

---

[11] 
https://greydynamics.com/vienna-a-city-of-spies-a-history-of-espionage/?
https://babel.ua/en/news/116525-austrian-intelligence-services-have-uncovered-a-russian-disinformation-campaign-directed-against-ukraine?
https://euromaidanpress.com/2024/06/29/wsj-vienna-has-become-major-russian-spy-hub-for-anti-western-operations-in-europe/?
https://apnews.com/article/austria-democracy-freedom-party-russia-kickl-espionage-a8e5e67808ad691d09e03fba10bacc4d
https://en.wikipedia.org/wiki/Austria_and_Russian_intelligence?
https://www.youtube.com/watch?v=Z0pxQNUEFjI
Last vested March 24, 2025.

rooted issues with political favoritism, bribery, influence-peddling, and questionable ties to Russian foreign interests. Here's an overview of why Austria has been perceived as corrupt:

**82. Political Corruption and Scandals**

- **Ibiza Affair (2019)** – The scandal involved then-Vice Chancellor **Heinz-Christian Strache** (FPÖ) being secretly recorded discussing political favors in exchange for support from a woman posing as a Russian oligarch's niece. The fallout led to the collapse of the Austrian government.

- **Sebastian Kurz's Resignation (2021)** – Kurz, the former Chancellor, was forced to resign after allegations surfaced that his party had used taxpayer funds to manipulate polls and secure positive media coverage. He was sentenced for perjury in 2024.

- **Judicial and Police Bias** – Austrian authorities have been accused of protecting political figures and obstructing corruption investigations. The Ministry of Interior and certain judicial officials have been implicated in covering up politically sensitive cases.

**83. Pattern of abuse of power by the Ministry of Interior and Ministry of Justice. The refusal to investigate and prosecute political assassinations that involve the direct participation of police officers. Systematical obstruction of**

**justice, intimidation of the witnesses, and malicious persecution of investigative journalists.**

- o The second-ranking official at the Ministry of Justice, Mr. Christian Pilnacek, was stopped by police officers after dining with the Hungarian ambassador. Several hours later, his body, bearing multiple injuries, was found in a river in Lower Austria.
- o The Ministry of the Interior refused to conduct an autopsy or investigate, and the Ministry of Justice declined to prosecute.
- o The incident was officially labeled as a "suicide." Mr. Pilnacek's widow faced intimidation from police officers and the President of Parliament, Wolfgang Sobotka. The police suppressed evidence and intimidated witnesses. Investigative journalist Mr. Peter Pilz faced malicious prosecution due to his independent investigations into the case.[12]

---

1212

https://dailynewshungary.com/austrian-strongman-found-dead-after-reception-at-hungarian-embassy-in-vienna/#google_vignette
https://www.vienna.at/doubts-about-police-work-after-pilnaceks-death-ombudswoman-schwetz-intervenes/9295400
https://www.reddit.com/r/Austria/comments/1ipayia/obduktionsbericht_n%C3%A4hrt_zweifel_am_klaren_suizid/?tl=en
https://www.ft.com/content/65d48762-43a5-41e6-b0de-8ed8928be05a
https://www.krone.at/3310669
https://zackzack.at/2025/03/16/pilnacek-u-ausschuss-die-falle-der-oevp
https://zackzack.at/2025/03/09/staatsanwaltschaft-krems-pilnacek-verfahren-daschlogn
https://zackzack.at/2025/03/07/laptop-video-teil-3-pilnacek-gefaehrtin-karin-wurm-packt-aus
https://zackzack.at/2025/03/06/pilnaceks-laptop-takacs-sobotka-und-fingerabdruecke

**84. Russian Influence and Espionage Links**

- Austria has a long-standing reputation as a hub for Russian intelligence activity due to its neutrality and close ties with Moscow.

- Figures like **Jan Marsalek** (former Wirecard COO) have been tied to Russian intelligence. Marsalek disappeared after the Wirecard $2 billion fraud scandal and is believed to be under Russian protection.

- **Johann Gudenus** (FPÖ) — Key figure in the Ibiza Affair, known for his pro-Russian stance and links to Kremlin-linked operatives.

- The proximity of individuals like **Florian Stermann** to both Austrian and Russian elites raises further concerns about political infiltration and influence.

**85. Business and Financial Corruption**

- The **Wirecard scandal** exposed how Austrian banks, politicians, and financial institutions allowed massive fraud and money laundering to go unchecked.

---

last visited on March 25, 2025.

- Austria's lax financial oversight and tax policies have made it a preferred destination for laundering Russian and Eastern European money.

## 86. Intelligence Failures and Foreign Infiltration

- Austria's intelligence services (BVT) have been compromised by Russian infiltration, leading to leaks of sensitive Western intelligence.
- The 2018 raid on the BVT (carried out by Austria's own Ministry of Interior under FPÖ control) was widely seen as an attempt to destroy evidence of Russian ties and political corruption.

**87.** Austria's financial institutions have been implicated in several money laundering schemes involving Russia and Ukraine. Notable cases include:

## 88. Raiffeisen Bank International (RBI):

- **RosUkrEnergo Involvement:** RBI managed RosUkrEnergo, a Swiss-registered company involved in opaque gas transactions between Russia and Ukraine. U.S. diplomats suspected that this entity was controlled by Russian organized crime figures, facilitating money laundering activities.[13]

---

13

https://en.wikipedia.org/wiki/Raiffeisen_Zentralbank?, last visited on March 23, 2025.

- **Troika Laundromat:** RBI was implicated in the Troika Laundromat, a vast money laundering operation orchestrated by Russia's former largest investment bank, Troika Dialog. This scheme funneled approximately $4.8 billion out of Russia between 2003 and 2013, involving numerous offshore entities and complex financial transactions.

- **Anglo Austrian Bank (formerly Meinl Bank):**

- **Money Laundering Allegations:** This bank faced allegations of facilitating money laundering activities. In 2020, it filed for bankruptcy following regulatory actions and investigations into its involvement in illicit financial activities.[14]

**89. Euram Bank:**

- **Regulatory Intervention:** In October 2024, Austria's financial regulator ordered Euram Bank to cease operations immediately due to deficiencies in its anti-money laundering measures. This action highlighted significant lapses in the bank's compliance protocols.

**90. Involvement in Russian Oil Sanctions Evasion:**

---

[14]
https://www.occrp.org/en/news/anglo-austrian-bank-files-for-bankruptcy, last visited on March 23, 2025.

- **Coral Energy Connections:** Investigations revealed that Austrian banks, including RBI, had financial ties with Coral Energy, a company implicated in helping Russia circumvent Western oil sanctions. These banks provided financing that facilitated the continued flow of Russian oil products to international markets despite sanctions.

- **Raiffeisen Bank is directly involved in laundering money for the Russian mafia.**[15]

**91.** These cases underscore the challenges Austrian banks have faced in maintaining robust anti-money laundering controls, particularly concerning financial activities linked to Russia and Ukraine.

## FACTUAL ALLEGATIONS

---

15

https://en.wikipedia.org/wiki/Raiffeisen_Zentralbank?utm_source=chatgpt.com
https://www.occrp.org/en/news/anglo-austrian-bank-files-for-bankruptcy
https://www.reuters.com/business/finance/austrian-watchdog-halts-business-euram-bank-2024-10-16/
https://www.lemonde.fr/en/les-decodeurs/article/2024/10/30/shell-companies-ghost-ships-and-secret-traders-how-russia-circumvents-western-oil-sanctions_6730981_8.html
https://euromaidanpress.com/2025/02/03/austrian-bank-faces-pressure-from-eu-and-us-after-profiting-from-russian-arms-industry/
https://www.reuters.com/business/finance/russia-hits-back-with-multi-billion-penalty-austrian-bank-2025-01-21/
https://www.swissinfo.ch/eng/austria%27s-raiffeisen-faces-us-wrath-over-russian-business/77646224
https://www.usnews.com/news/world/articles/2024-03-06/top-us-sanctions-official-delivers-warning-to-austria-on-russia
https://www.leaprate.com/financial-services/raiffeisen-an-austrian-bank-is-being-probed-for-money-laundering/

**92.** After sanctions were imposed on Russia following the annexation of Crimea in 2014, the Austrian Ministry of Foreign Affairs in Vienna and the Embassy of the Republic of Austria in Washington, D.C. (the "Austrian Embassy") organized a network of so-called "trusted layers of the Republic of Austria" in the U.S. and other countries to facilitate money laundering services to circumvent the anti-Russian sanctions. The Embassy and Ministry appointed five so-called "trusted lawyers" in the U.S. and tasked them with founding multiple shell companies for further use in the money laundering business.

**93.** On October 17, 2015, Defendant Ms. Rolff, a private Florida bar attorney residing in Florida, was appointed (by recommendation of the Honorary Consul of Austria), by the Austrian Federal Ministry for European and International Affairs through the Austrian Embassy in Washington D.C. as the so-called "trusted lawyer of Austria in the United States".

**94.** Ms. Rolff conspired with corrupt Austrian officials linked to the Austrian Embassy in Washington, D.C., to launder money stolen from the Austrian budget and obtained through criminal activities and to assist Austrian banks and trade partners in circumventing the sanctions against Russia.

**95.** Ms. Rolff established and organized financial and legal connections with subsidiaries of Russian strategic enterprises in the United States to create channels

for bilateral cash flows that circumvent anti-Russian sanctions imposed after the annexation of Crimea in 2014.

96. Ms. Rolff also founded, operated, and controlled numerous shell companies domestically and abroad and restructured the work of existing enterprises, including Rolff Law P.A., Magnificent Obsessions Inc., etc., in a new way.

97. She opened bank accounts for these companies and received (among other transactions), Austrian budget funds from the Austrian Embassy, various Austrian governmental and non-governmental organizations, as well as funds generated from international commercial and business activities for fictitious services that neither she nor the companies she controlled provided.

98. Ms. Rolff issued false invoices for fictitious legal and other services to her foreign principals.

99. Ms. Rolff withdrew cash money from her companies and paid kickbacks to the Austrian Embassy corrupt officials.

100. She also distributed the laundered funds among the accounts of the entities and companies she controlled, as well as transferred them to the bank accounts of her co-conspirators.

**101.** Ms. Rolff's shell companies did not have any employees, offices, or business facilities.

**102.** Mr. Rolff conspired and collaborated with Mr. Dale F. Webner at Miller & Webner P.A., who was fully aware of Ms. Rolff's criminal activities, with the intent to launder money.

**103.** On May 16, 2022, following the transactions that occurred in Austria, the Plaintiffs filed a civil RICO suit *Dvoinik v. Philipp* in the United States District Court for the Middle District of Florida against Austrian individuals, including Susanne Hoflinger (former police officer), Thomas Hoflinger (private person, husband of Susanne Hoflinger), Gunda Ebhart (public prosecutor), Mario Rabl (police officer), and Peter Philipp (private Vienna attorney), in their personal capacities. Plaintiffs cited predicate acts of extortion and obstruction of justice that occurred in Austria.

**104.** The Plaintiffs later voluntarily dismissed the complaint against more than five of the original defendants named above.

**105.** On June 8, 2022, the Plaintiffs submitted a renewed criminal complaint by postal service to the Austrian Economic and Corruption Prosecutor's Office (Wirtschafts- und Korruptionsstaatsanwaltschaft Wien), alleging multiple RICO

predicate acts committed against them in Austria, including extortion, obstruction

of justice, and theft of their property. (EXHIBIT 8).

**106.** Defendant Republic of Austria failed to initiate the criminal

investigation and failed to respond.

**107.** The corrupt Austrian judge Mr. Erich Csarmann called the Plaintiffs'

attorney Mr. Norbert Haslhoffer in Austria instead and demanded that the Plaintiffs

"arrive in Austria immediately".

**108.** The attorney advised not to enter Austria due to reasonable fear of

retaliation actions, malicious persecution, and danger to health and life

**109.** No investigations were initiated or conducted.

**110.** Following the completion of service of process on the defendants in

*Dvoinik v. Philipp* and the Austrian Central Authority in accordance with the

Hague Convention (1965), defendant Ms. Gunda Ebhart, a Lower Austrian

prosecutor, issued three official documents:

**111.** A notice of termination of the criminal investigation against Elena

Dvoinik. **(EXHIBIT 2) A notice of termination of the criminal investigation**

**against Boris Zavadovsky**. **(EXHIBIT 2)** A notice of the initiation of a new

criminal investigation resulted from Mario Rabl's testimony about his alleged

"investigations against Elena Dvoinik and Boris Zavadovsky in the United States"
against both Plaintiffs for the alleged forgery of:

- o   Receipts from U.S. Army medical doctors,

- o   Plaintiffs' New York dentist, Dr. Nathan Hershkowitz,

- o   Medical receipts from NYU,

- o   Invoices from a Miami optometrist associated with the Floridian
      optical boutique operating under the trademark "Edward Beiner," and

- o   Alleged insurance fraud involving a $988 claim based on an "Edward
      Beiner" invoice.

In December 2022, the Austrian Ministry of Justice sent the Plaintiffs a
notice dated July 8, 2022, regarding the initiation of an investigation, which was
produced in the Russian language, via DOJ and FedEx. (**EXHIBIT 3**).

**112.** After the termination of initial criminal investigations against Ms.
Dvoinik and Mr. Zavadovsky, Austrian authorities lost all legal and formal
grounds for withholding the Plaintiffs' valuable property. The so-called "new
criminal investigation" was entirely unrelated to the property at issue.

**113.** Despite this, Austrian authorities have refused to return the Plaintiffs'
stolen property or investigate the theft, extortion, and obstruction of justice.

Austrian authorities have also failed to respond to the Plaintiffs' repeated requests for action.

**114.** The Plaintiffs consistently notified Austrian authorities of the ongoing harm caused by the refusal to return their educational documents, medical records, and tax-related documents, which has prevented them from securing employment and earning income.

**115.** Austrian authorities were fully aware of the Plaintiffs' contact information, including their U.S. addresses, mailing addresses, email addresses, and telephone numbers from multiple complaints, yet failed to take any action.

**116.** On July 28, 2022, the Plaintiffs filed a civil lawsuit against the Republic of Austria with the District Court for the Middle District of Florida, *Dvoinik v. Austria.*

**117.** Defendant(s) John Doe(s), corrupt officials from the Austrian Ministry of Foreign Affairs and employees of the Austrian Embassy—specifically those, or those affiliated with those, who facilitated the transfer of funds into Ms. Rolff's account for sham services and for Ms. Rolff's activities as an unregistered foreign agent in exchange for kickbacks—contacted Ms. Rolff and proposed a scheme to launder Austrian budget funds and to promote false pretenses regarding plaintiffs'

property at issue that had been previously stolen in Austria. Ms. Rolff accepted the scheme and knowingly participated in its execution. Ms. Rolff also consented to arrange the filing of a motion to dismiss due to lack of subject matter jurisdiction in the case *Dvoinik v. Republic of Austria* and the filing of a motion to dismiss in Plaintiffs' case against private Austrian persons, Hoflingers, Rabl, Philipp and Ebhart.

**118.** Austrian John Doe(s) conveyed to Ms. Rolff the promotion of false pretenses regarding the Plaintiffs' stolen property at issue through public dissemination of false information about alleged ongoing criminal investigations in Austria against the Plaintiffs, along with hearsay claims that the Plaintiffs allegedly litigated in Austria concerning the conversion of this property, which they lost, appealed, and lost again. John Doe(s) also asked Ms. Rolff to intimidate Plaintiffs and spread information that the Plaintiffs are allegedly illegal immigrants who falsified their identities, and she agreed.

**119.** Ms. Rolff did not personally perform any paper, legal or other work except conducting the financial transactions; she conveyed "the job" to her co-conspirator, Florida bar attorney Mr. Dale Webner.

**120.** Since Fall 2022, Mr. Webner has filed numerous documents with the federal courts that harass the Plaintiffs, including insults and defamatory, false

statements regarding the Plaintiffs' alleged criminal activities, as well as claims that they litigated in Austria over the conversion of their property and supposedly lost all trials and appeals. (See EXHIBIT 4.)

**121.** Ms. Rolff and Mr. Webner failed to obtain written retainers from the Austrian Finanzprokuratur, as required by Austrian law, Finanzprokuraturgesetz.[16]

**122.** Ms. Rolff and Mr. Webner also failed to register with the Attorney General as FARA 22 U.S.C. § 612 et. seq. requires.

**123.** Ms. Rolff shared her attorney fees with Mr. Webner.

**124.** Mr. Webner provided limited representation to Hoflinger, Hoflinger, Rabl, Ebhart, Philipp and the Republic of Austria.

**125.** Ms. Rolff and Mr. Webner failed to obtain informed consent in writing from any of their clients for simultaneous representation despite the potential conflict of interest, for limited representation, for financing by a third party, and for sharing the attorney's fees.

---

[16] §4(8) ProkG (Finanzprokuraturgesetz BGBl 110/2008), https://www.jusline.at/gesetz/prokg/paragraf/4, last visited on March 23, 2025.

**126.** Neither Ms. Rolff nor Mr. Webner ever communicated with their clients Hoflinger, Hoflinger, Rabl, Ebhart, Philipp.

**127.** The Defendant(s) John Doe(s) conspired and began to pay the fake Ms. Rolff's invoices by wiring funds to IOLTA account of her Rolff Law P.A.

**128.** Ms. Rolff began receiving dollar amounts from the budget accounts of the Austrian Ministry of Justice ("AMJ") and the Austrian Ministry of Interior ("AMI") on her Rolff Law P.A. IOLTA account, with the transfer purposes related to fictitious legal services for **fifteen** AMJ and AMI officials who were allegedly attacked and sued in their official capacities in Florida Federal Courts by Plaintiffs.

**129.** The Republic of Austria does not offer any financial assistance to its citizens, private individuals, or officials in private civil or criminal litigation matters or abroad.[17]

**130.** Ms. Rolff partially transferred received Austrian funds to the IOLTA account of her co-conspirator Mr. Dale Webner.

---

[17] https://www.bmeia.gv.at/en/austrian-embassy-tbilisi/service-for-citizens/assistance-in-legal-matters, last visited on March 23, 2025.

**131.** Ms. Rolff conspired with Mr. Webner to create fake invoices for unperformed legal services on behalf of her firm, Rolff Law P.A. She fabricated these invoices and returned them to her co-conspirators, John Doe(s) defendants.

**132.** Ms. Rolff and Ms. Webner withdrew in cash the funds deposited by the Austrian Ministries into their IOLTA accounts.

**133.** Ms. Rolff deposited the received money into accounts of her multiple shell companies and paid kickbacks to Defendant(s) John Doe(s).

**134.** Ms. Rolff never filed notices of appearance and never appeared in any litigation of Austrian defendants in any Plaintiffs' related cases.

**135.** Mr. Webner appeared on August 15, 2022, via email and introduced himself to the Plaintiffs as "an attorney of the Austrian defendant, Vienna attorney Mr. Philipp".

**136.** Mr. Webner claimed to be not related in any way with any other defendants in Plaintiffs lawsuits.

**137.** On October 3, 2022, Mr. Webner offered the Plaintiffs the opportunity to hire him as an attorney against the Republic of Austria.

**138.** Mr. Webner concealed the fact that he was acting as a foreign agent of the Republic of Austria, its Embassy and its Ministries of Justice and Interior.

**139.** He falsely claimed to be an experienced litigation attorney specializing in German, Austrian, and International Law, who had allegedly won 50 complex litigations. He also falsely asserted that he was an expert in legal malpractice cases, which he had won as counsel. He stated that he frequently testifies as a legal expert in legal malpractice cases in Florida courts and the Florida Supreme Court due to his 40 years of experience and excellent reputation within the community, as judges often rely on his legal opinion.

**140.** Mr. Webner emphasized that it would be very difficult for Ms. Dvoinik and Mr. Zavadovsky to litigate against the Republic of Austria pro se without experienced counsel like him. He advised that the Plaintiffs should withdraw their RICO complaint against Austrian private individuals. Even if the court were to rule in the plaintiffs' favor, the Republic of Austria would not enforce the U.S. court decision.

**141.** If the Plaintiffs do not withdraw their complaint against Austrian private individuals, they (Plaintiffs), will face a lawsuit in Austria in criminal court. Mr. Webner allegedly learned from his connections in U.S. government that the Austrian intelligence services are investigating the plaintiffs in the States, but

he can handle the situation. Mr. Webner "knows judges." If the Plaintiffs do not

withdraw their claims against Austrian officials, the Austrian Embassy will seek

assistance from the U.S. intelligence service, and the Plaintiffs may be detained

and deported to Austria. The Plaintiffs must withdraw their RICO complaint; they

cannot fight against a European country. If they choose not to hire Mr. Webner, the

Republic will retain him and pay him from the Austrian budget, which is

unlimited. If Austria retains Mr. Webner, he will delay all legal processes through

appeals, leaving the plaintiffs with no result.

**142.** The Plaintiffs rejected his offer.

**143.** Mr. Webner has withdrawn from representing Peter Philipp and

appeared in *Dvoinik v. Philipp* as an attorney for Hoflinger, Hoflinger, Rabl, and

Ebhart.

**144.** Ms. Rolff, Mr. Webner, and John Doe(s), the defendants, conspired to

fabricate false evidence for further use in federal RICO litigation *Dvoinik v.*

*Philipp*: affidavits from Mario Rabl and Susanne Hoflinger containing false

statements: "I have no and never had any business or commercial contacts of any

type with Florida or anywhere else in the United States". (EXHIBIT 9)

**145.** Mr. Webner drafted the affidavits while the defendants, John Doe(s), arranged for Rabl and Hoflinger in Austria to notarize them. John Doe(s) sent the notarized copies to Ms. Rolff, who then forwarded them to Mr. Webner, and he filed these affidavits with the federal court on October 28, 2022.

**146.** Plaintiffs filed the defamation complaint against Susanne Hoflinger and Mario Rabl, *Dvoinik v. Rabl* (dismissed for lack of personal jurisdiction. See also pending case *Zavadovsky v. Cheatle*, 24-01997, D.D.C.).

**147.** On November 23, 2022 Ms. Rolff claimed to be an Austrian official, an Austrian Counsel of Trust, and an Austrian Government Attorney in the United States.

**148.** Ms. Rolff asserted that she had the authority to negotiate and settle all cases in the United States on behalf of the Republic of Austria and the Austrian Central Authority, including the Austrian Ministry of Justice, the Austrian Ministry of Interior, and the Austrian Ministry for European and Foreign Affairs.

**149.** Ms. Rolff stated that she was representing the Republic of Austria in *Dvoinik v. Austria*, Case No. 8:22-cv-01700, before the United States District Court for the Middle District of Florida.

**150.** Ms. Rolff further claimed that Mr. Dale Webner had been retained because, during his representation of Mr. Peter Philipp, Mr. Webner conducted extensive research and gained a thorough knowledge of all relevant case details.

**151.** Ms. Rolff offered to immediately terminate the "prosecution" against Ms. Dvoinik and Mr. Zavadovsky in Austria in exchange for the withdrawal of all claims currently pending in the United States against Austrian defendants.

**152.** Ms. Rolff stated that she had carefully considered the concerns raised by Ms. Dvoinik regarding Austria's continued withholding of her and her husband educational, medical, business, and tax-related documents. She acknowledged that failure to return these documents immediately could result in:

- o Foreclosure on Plaintiffs' Austrian real estate property;
- o Sanctions imposed by Ms. Dvoinik's business partners for breach of contract due to the conversion of business documents; and
- o Penalties were imposed on Mr. Zavadovsky by the German tax authorities (German IRS).

**153.** Ms. Rolff also acknowledged the claim regarding the seizure of Libson's archive and a collection of antique coins.

**154.** Ms. Rolff stated that Ms. Dvoinik and Mr. Zavadovsky were not required to approach any other Austrian or U.S. officials concerning these matters, claiming that she would personally convey all relevant information to the appropriate Austrian authorities and will resolve it.

**155.** Ms. Rolff asserted that she was fully authorized to negotiate and resolve these issues as a liaison officer.

**156.** Ms. Rolff claimed that, while she had the authority to handle these matters, she required material evidence to proceed. She asked whether Ms. Dvoinik possessed any relevant documents or items and instructed that they be provided to her as soon as possible. Ms. Rolff emphasized that she needed to verify Plaintiffs' lawful connection to **Libson's archive** before taking further action.

**157.** In response to Ms. Dvoinik's statement that she and Mr. Zavadovsky had substantial physical evidence stored in Austria, Ms. Rolff advised that the evidence must be made available in the United States, not in Austria. When Ms. Dvoinik confirmed that she and Mr. Zavadovsky planned to travel abroad to collect the evidence, Ms. Rolff inquired about the specific timing of their trip and when they expected to deliver the evidence.

**158.** Ms. Rolff requested that Ms. Dvoinik provide a detailed list of the documents and items she intended to submit. Ms. Rolff stated that upon receipt of this list, they could proceed with resolving these matters.

**159.** Plaintiffs relied on Ms. Rolff's promise to address the issues and departed for Europe the next day to provide her with the evidence.

**160.** Plaintiffs obtained the evidence through friends' aid without visiting Austria due to a reasonable fear of retaliatory actions and malicious persecution from RICO members involved in an extortion scheme 2021.

**161.** From December 2022 to January 2023, the Plaintiffs separated, organized, and scanned evidence and transmitted the listings to Ms. Rolff and Mr. Webner.

**162.** Ms. Rolff failed to respond.

In February 2023, Mr. Webner informed the Plaintiffs that Ms. Rolff allegedly has no relation to Austria, its government, or its Embassy in any capacity. She is reportedly a "German-speaking co-counsel whom Mr. Webner hired to translate German to English."

**163.** Due to Mr. Zavadovsky's failure to provide tax-relevant documents for the tax audit, the German IRS imposed sanctions on him and arrested his only source of income, his pension. Austrian Raiffeisen Bank initiated a foreclosure on the Plaintiff's house . Plaintiffs suffered supplemental pecuniary harm with supplemental damages over $800.000 and experienced severe emotional distress.

**164.** Plaintiffs noticed Ms. Rolff about that, but she failed to respond.

**165.** Ms. Rolff, Mr. Webner, and John Doe(s), the defendants, conspired to fabricate a new portion of false evidence for further use in federal RICO litigation *Dvoinik v. Philipp* and in federal litigation *Dvoinik v. Rabl*:

**166.** Affidavits from Mario Rabl and Susanne Hoflinger containing false statements: (EXHIBIT 10,11)

    a.  I did NOT alone or in complicity with Defendant Rabl [Hoflinger] or any other Defendant contact via cell phone other phone, mail, email, text, or by any other means nor send anything pertaining to Plaintiffs as alleged in paragraphs 94 and 99 or any other paragraph of the Second Amended Complaint to:

        i.  Barnes &      Noble Holding in Miami-Dade County or any other location at any time.

        11.  Department of Orthopedic Surgery NYU in New York or any other location at any time.

        iii.  112619 Delaware Acquireco Inc. D/B/A Edward Beiner on Brickell in Miami-Dade County, Florida or any other location at any time.

        iv.  Hospital for Joint Diseases in New York or any other location at any time.

        v.  Interfaith Medical Center in Brooklyn in New York or any other location at any time.

        v1.  Hotel Beacon in New York or any other location at any time.

        vii.  Landstuhl Regional Medical Center, a US Army hospital, in Germany or any other location at any time.

        viii.  Dr. Nathan Hershkowitz in Brooklyn, New York or any other location at any time.

        1x.  New York University in New York or any other location at any time.

    2.  Contacts with any of the entities alleged and identified by Plaintiffs in paragraphs 94 and 99 of the Second Amended Complaint were not performed by me, but were performed by a U.S. agency on the basis of a request for mutual international police assistance submitted by the Austrian authority.

    3.  I have no and never have had any business or commercial contacts of any type with Florida or anywhere else in the United States.

**167.** The affidavits were executed in the same way as in ¶145 of this complaint.

**168.** Mr. Webner filed the false affidavits with the S.D.Fla. on March 30, 2023; and with the M.D.Fla. on April 04, 2023.

**169.** The Austrian authority did not submit the request for mutual international police assistance, and the U.S. agency did not provide the assistance.

**170.** Austrian authority did not investigate in 2021 the Plaintiffs' medical treatments in U.S., their alleged fraud or tax evasion.

**171.** The investigations were initiated on July 08, 2022, based on Mario Rabl's false testimony about his alleged investigations against Plaintiffs in the U.S.

**172.** The "Edward Beiner" receipt is authentic. See pending *Zavadovsky v. Cheatle.*

**173.** Plaintiffs filed civil complaints against Mr. Webner and Ms. Rolff, as well as reported their criminal foreign agents activity to FBI and Florida bar.

**174.** On May 12, 2023, Mr. Webner appears via Zoom on Rule 26(f) conference in *Dvoinik v. Rabl.*

**175.** Mr. Webner humiliated and harassed Plaintiffs stating the follows: (here DW-Dale Webner, ER -Elke Rolff, ED-Elena Dvoinik, BZ-Boris Zavadovsky.)

ER is simply a German-speaking co-counsel. DW hired her to assist with the translation of German documents.

b) ED and BZ will be deported from the United States at the request of the Republic of Austria soon. It does not matter what status ED and BZ have in the U.S., as under U.S. law, they are considered illegal immigrants.

c) ED and BZ are well aware that Interpol, the Austrian intelligence service, and the U.S. intelligence service have been investigating them at the request of the Austrian competent authorities.

d) ED and BZ are playing a deceitful game.

e) ED and BZ are criminals. U.S. judges will never trust ED and BZ.

f) ED and BZ are liars, and they know it.

g) ED and BZ did not suffer any harm. They are merely trying to hit the jackpot.

h) ED and BZ will be liable for all damages they caused to the Republic of Austria.

i) DW does not understand what ED says. She needs an interpreter as she cannot speak English.

j) ED and BZ believe that the litigation process occurs like in Hollywood movies, but it does not. This is not a game.

k) ED and BZ do not understand the U.S. legal system. They are representing themselves, while DW is an attorney.

l) DW will draft and file the joint Case Management Report (agenda of the meeting) with the court. ED and BZ must sign DW's draft. If they do not sign, the case [Dvoinik v. Rabl] will be dismissed under the Federal Rules of Civil Procedure, and ED and BZ will face joint and severe sanctions.

m) DW needs all copies of ED and BZ's immigration documents and IDs to "simplify the process of investigations of BZ's and ED's false identities".

n) DW will present "some documents in German" to ED and BZ, ask questions, and afterward, they will regret starting their deceitful game.

o) The FARA allegations from ED and BZ are absurd. They are delusional.

p) It is not ED and BZ's concern how Austrians pay for their legal services in the U.S.

q) It is not ED and BZ's business to know who hired DW and ER, paid them, or who provided factual information in all cases, as Austria is immune.

r) DW cannot reveal the name of the "U.S. agency" mentioned in the affidavits because that information is privileged, and DW is protected by Austrian law.

s) The Austrian competent authority officially requested legal assistance in investigations against ED and BZ in the U.S. from the competent U.S. authority under Austrian law, the Austrian Polizeikooperationsgesetz, and the U.S. authority investigated and transmitted an official report on all investigations to Austria and DW has seen this report personally.

t) It is absurd to demand that Austria enforce its own laws.

**176.** Mr. Webner also demanded that all complaints, including *Dvoinik v. Austria*, be voluntarily withdrawn "until it is too late."

**177.** The Plaintiffs suffered severe emotional distress during and after the conference because they relied on attorneys' threats of malicious persecution from corrupt Austrian and U.S. officials.

**178.** The Plaintiff Zavadovsky, who was 72 years old at the time of the conference, suffered significantly more emotional distress due to the reasonable fear of Austrian persecution than the plaintiff, Dvoinik. The emotional distress caused elderly plaintiff Zavadovsky to experience an atrial fibrillation attack (without any prior history, symptoms, or predispositions) on June 4, 2023, along with personal injury and subsequent heart surgery, resulting in medical bills exceeding $128,000.

**179.** During the personal meeting between Ms. Rolff, Ms. Dvoinik, and Mr. Webner on October 21, 2023, in Miami, Mr. Webner intimidated Ms. Dvoinik and

made misleading statements, and Ms. Rolff confirmed her agreement with Mr.

Webner's actions.

**180.** Mr Webner stated:

a) Austrian Finanzprokuratur hired us.
b) Lead attorney of Austrian Finanzprokuratur from Vienna has personally hired us.
c) Yes, I spoke with him personally remotely many times.
d) Yes. Dr. Wolfgang Peschorn.
e) [in response to showing 6 phantom photos] Yes. This person. [DW have chosen the photo of Wolfgang Peschorn and ER confirmed.]

ER confirmed (a)-(e).
g) Austrian Embassy will solve all problems with judges. It is a political question. Judges have no power here.
h) We did not involve in money laundering. We are simply doing our legal job and protecting the Republic of Austria from such pro se as you.
i) You do not understand what is FCPA means, you have simply googled it and written it down.
j) You are playing the false games.
k) You must calm down. You did not suffer any harm.
l) We did not violate FARA because DOJ ignored your complaint to FARA unit. It means that your complaints are baseless.
m) You must sign the documents which I prepared [performed case management report, contained prepared in advance alleged "results of current case management conference from October 21" and "joint CMR and ORDER".]
n) If you will refuse to sign it up, the judge will dismiss the case next week.
o) How are you not afraid to fly without documents?
p) May I see your passport?
q) I need all your addresses, and you must tell me about all the places of your factual stay.
If you do not voluntarily provide me with copies of all your immigration documents and passports, your deportation from the States will occur quite soon.
s) We will seek your extradition. You are trying to undermine Austrian statehood and the legal system.
t) [In response on the question "How am I trying to undermine Austrian statehood and the legal system"] with your complaints and attempts to get money from Austria and its Counsels.

**181.** On November 9, 2023 Mr. Webner served Ms. Dvoinik with Interrogatories executed by Ms. Rolff under oath, in federal RICO case *Dvoinik v. Rolff.*

In her interrogatories (EXHIBIT 7), Ms. Rolff:

- o admitted to be appointed as a so-called trusted lawyer of the Republic of Austria in October 2015;

- o admitted that she served as a foreign agent for various governmental and non-governmental entities in matters unrelated to any litigation;

- o admitted that she never participated in the U.S. courts' litigations as an attorney except few probate cases;

- o admitted that she was never registered with the Attorney General under FARA;

- o admitted that neither she nor Mr. Webner ever communicated with their clients, Rabl, Hoflinger, Hoflinger, Ebhart, Philipp;

- o admitted that all information filed with the federal courts in all Plaintiffs cases was generated during discussions with John Doe(s) defendants and Mr. Webner;

- o admitted that she received Austrian budget founds on her IOLTA account from Austrian Ministry of Interior and Austrian Ministry of Justice, partially withheld and partially transferred the funds to Mr. Webner's IOLTA account;

    o  admitted to be coordinated, commanded, controlled and supervised by

        Austrian officials from Austrian Ministries and Austrian Embassy.

**182.** Ms. Rolff refused to name any Austrian persons, Defendants John Doe(s).

**183.** Ms. Rolff asserted that she and Mr. Webner were appointed as the

counsels in all Plaintiffs' U.S. cases by the Austrian Solicitor General (Lead

attorney of the Finanzprokuratur).

**184.** Ms. Rolff made a false statement asserting that: "The U.S. Secret Service

conducted the investigations [against Plaintiff resulted to initiation of criminal

investigation in Austria for alleged forgery of U.S. medical bills and $988 fraud] in

U.S., in accordance with the applicable Austrian laws, and the U.S. Secret Service

reported their findings back to Austria with a written report . . ., which attorney

Webner and I have personally seen".

**185.** Plaintiffs emailed the Austrian Embassy and Austrian law enforcement but

received no results.

**186.** The Defendant Republic of Austria refused to investigate and to respond.

**187.** The President of Austrian Finanzprokuratur, Austrian Solicitor General,

Mr. Wolfgang Peschorn stated under oath the following:

> I have reviewed the Complaint and Appendices and note the
> allegations about the search warrant and related events in Austria,
> the several lawsuits pending or previously pending in the United
> States federal court , and the dealings with the attorneys handling
> those lawsuits, Defendants, Dale Webner and Elke Rolff, but I have
> had nothing to do with the search warrant and related events, nothing

> to do, with any of the U.S. federal lawsuits, and nothing to do with
> the attorneys, who except for preparing this Affidavit, I had never
> met, spoken to, or had any dealings of any type with.

(See EXHIBIT 5 )

**188.** Despite Mr. Peschorn's statement, the Defendant Republic of Austria did not withdraw Mr. Webner from its representation and completely ignored the Plaintiffs' complaints about ongoing harm once again. It also refused to investigate, violating various provisions of Austrian law.

**189.** The Austrian Embassy continued to "bomb" U.S. courts with numerous Nota Verbale in support of Mr. Webner and Ms. Rolff.

**190.** Plaintiffs requested all files related to their names from the Secret Service under FOIA. *See* related case *Zavadovsky v. Cheatle,* 24-01997.

**191.** On December 21, 2023, the FOIA Secret Service officer responded with "no records".

**192.** Plaintiffs filed this response with the federal court, S.D. Fla. on December 27, 2023.

**193.** Austrian John Doe defendant(s) contacted the Secret Service, revealed the email correspondence from October-November 2021 between Rabl, Hoflinger and their buddy, a German-speaking Secret Service agent, and made a false statement to the Secret Service officer(s) asserting that "there are ongoing criminal investigations against Boris Zavadovsky and Elena Dvoinik in Austria". (See EXHIBIT 6)

**194.** Upon information and belief, on or around December 27, 2023, John Doe(s) Defendant(s) paid a bribe to the unknown Secret Service officer for altering the agency's records (from "no records" into "potential files detected but cannot be released under the FOIA ongoing investigations exception"), for unlawful disclosure of confidential emails from Secret Service FOIA officer to Plaintiffs and for unlawful concealment of the detected email correspondence from October-November 2021 between Rabl, Hoflinger and unknown Secret Service from Plaintiffs and public with the purpose to avoid criminal and civil liability for involved Austrian and U.S. persons.

**195.** An Unknown Secret Service FOIA officer altered the agency's record.

FOIA officer Mr. Tyrrell notified both Plaintiffs on January 7, 2024, by sending personal, confidential emails to their private email addresses.

**196.** An unknown Secret Service officer provided copies of these emails to Austrian John Doe(s). They provided it to Mr. Webner.

**197.** On January 11, 2024 Mr. Webner, being fully aware that emails were unlawfully obtained, filed these private Plaintiffs' emails with the Southern District Court of Florida in the publicly available docket.

**198.** He also filed with the Southern District Court of Florida the corrected email correspondence from October to November 2021 between Rabl, Hoflinger, and an unknown Secret Service officer.

199. In his notice to the District Court, Mr. Webner offered to disclose "all Plaintiffs' Austrian criminal case file" if necessary to " rebut personal jurisdiction" in the pending case *Dvoinik v. Rabl.*

200. Later, Mr. Webner stated that he did not ever receive any other documents from Austrian criminal case except published email correspondence between Rabl, Hoflinger and unknown Secret Service agent.

201. The Plaintiffs were never provided with the email correspondence at issue, although they were entitled to it under the Due Process Clause.

202. It is a crime in Austria to disclose or publish criminal case files.

203. After that, the Plaintiffs filed the complaint in the related case, *Zavadovsky v. Cheatle.*

## CLAIMS FOR RELIEF

## COUNT I – VIOLATION OF RICO (18 U.S.C. § 1962(c))

**against all Defendants**

204. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

205. The Defendant Republic of Austria, through its agents, U.S. attorneys Dale Webner and Elke Rolff, and officials, including John Doe(s) Defendants at

the Austrian Ministry of Foreign Affairs and the Austrian Embassy in Washington D.C., engaged in an enterprise through a pattern of racketeering activity, including: a. Money laundering (18 U.S.C. § 1956); b. Wire fraud (18 U.S.C. § 1343); c. Mail fraud (18 U.S.C. § 1341); d. Obstruction of justice (18 U.S.C. § 1503); e. Extortion (18 U.S.C. § 1951).

**206.** To establish the existence of a RICO Enterprise under 18 U.S.C. § 1962(c), Plaintiffs must demonstrate the following elements:

**207.** An enterprise – a legal entity, association, or group of individuals acting together.

**208.** Engagement in a pattern of racketeering activity – at least two predicate acts of racketeering activity within a 10-year period.

**209.** Conduct or participation in the enterprise's affairs through the commission of predicate acts.

**210.** An effect on interstate or foreign commerce.

**211.** The following paragraphs from the factual allegations in the pleading support the existence of a RICO enterprise:

**ALLEGATIONS ESTABLISHING THE EXISTENCE OF A RICO ENTERPRISE**

(In Support of 18 U.S.C. §§ 1962(c) and 1962(d) Claims)

**212.** Plaintiffs ELENA DVOINIK and BORIS ZAVADOVSKY incorporate by reference all preceding paragraphs of the complaint.

## A. Legal Standard

**213.** Under 18 U.S.C. § 1961(4), a RICO "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

**214.** A RICO enterprise requires:

- o A common purpose among members;
- o Relationships among those associated with the enterprise;
- o Longevity sufficient to permit the enterprise's purpose to be pursued. (See *Boyle v. United States*, 556 U.S. 938, 944 (2009)).

## B. Composition and Structure of the Enterprise

**215.** The RICO enterprise consists of a group of individuals and entities associated-in-fact, including:

- o The **Republic of Austria**, through its **Ministries of Justice, Interior, and Foreign Affairs**;

- The **Austrian Embassy in Washington, D.C.**;

- Attorneys **Elke Rolff** and **Dale Webner**;

- Unnamed corrupt Austrian officials and diplomats referred to as **John Doe(s)** (¶92–101, ¶117, ¶182).

216. The enterprise functioned through a hierarchical and coordinated structure involving:

- Direction and funding from Austrian ministries;

- Legal and financial facilitation by Rolff and Webner;

- Procedural and reputational attacks on Plaintiffs in U.S. courts;

- Use of diplomatic channels and Nota Verbale to interfere with U.S. proceedings (¶189).

## C. Common Purpose of the Enterprise

217. The shared objective of the enterprise was to:

- Conceal the unlawful seizure of Plaintiffs' property in Austria (¶113–114);

- Launder Austrian government funds under the pretense of legal services in the U.S. (¶127–133);

- Defame, threaten, and obstruct Plaintiffs' civil actions in U.S. courts (¶120, ¶168–170);

- Intimidate Plaintiffs through threats of prosecution, extradition, and retaliation (¶175–181).

**218.** The members of the enterprise acted **with continuity and coordination** over several years, beginning at least as early as 2015 with Ms. Rolff's appointment as a "trusted lawyer" of Austria (¶92), and continuing through at least 2024.

### D. Relationships Among Members

**219.** The Austrian government, acting through **John Doe(s)** and Embassy personnel, provided:

- Appointments (¶92), instructions (¶117), and budget funding (¶128–130) to Rolff and Webner;

- Legal directives to spread false narratives about Plaintiffs (¶118–119, ¶145);

- Facilitation of false affidavits and fabricated documents (¶144–146, ¶165–168).

**Ms. Rolff:**

o Created shell companies and false invoices (¶¶96–99, ¶131);

o Distributed laundered funds to herself, Mr. Webner, and John Doe(s) (¶133);

o Admitted under oath to acting on instructions from Austrian ministries (¶181).

**Mr. Webner:**

o Submitted knowingly false court documents (¶168);

o Threatened Plaintiffs with coordinated diplomatic and legal retaliation (¶175–181);

o Acted as liaison between the Austrian Embassy and the U.S. legal system, despite no proper authorization or registration under FARA (¶122).

## E. Longevity and Pattern of Conduct

**220.** The enterprise operated from **2015 to at least 2024**, as evidenced by:

- Rolff's ongoing designation as Austrian "trusted lawyer" (¶92);

- Use of U.S. courts to file fraudulent affidavits and obstruct litigation (¶144–146, ¶168–169);

- Longstanding financial transfers from Austria to Rolff's IOLTA accounts (¶128–130);

- Repeated threats and coercive efforts during litigation, including statements made as recently as October and November 2023 (¶179–181).

## F. Acts in Furtherance of the Enterprise

**221.** The enterprise committed or facilitated numerous racketeering acts, including:

- **Wire fraud** (18 U.S.C. § 1343): False court filings, invoices, and correspondence (¶96–99, ¶144);

- **Mail fraud** (18 U.S.C. § 1341): Fabricated affidavits and documents sent via mail and FedEx (¶111, ¶168);

- **Obstruction of justice** (18 U.S.C. § 1503): False filings and interference in FOIA requests (¶197–199);

- **Extortion** (18 U.S.C. § 1951): Threats to Plaintiffs' liberty and property (¶175–180);

- **Money laundering** (18 U.S.C. §§ 1956, 1957): Transfers through Rolff and Webner's accounts using Austrian public funds (¶127–133, ¶181).

## G. Injury to Plaintiffs

**222.** As a direct and proximate result of the RICO enterprise:

- Plaintiffs lost valuable property exceeding $6,000,000;

- Plaintiffs suffered reputational harm due to defamation;

- Plaintiff Zavadovsky suffered a cardiac medical event from emotional distress (¶178);

- Plaintiffs incurred substantial legal costs, emotional trauma, and financial penalties in Germany (¶163).

**223.** Austria's actions constitute a commercial activity under FSIA (28 U.S.C. § 1605(a)(2)) because Austria, through its Ministry of Foreign Affairs and the Austrian Embassy, facilitated and funded money laundering schemes, employed private attorneys to influence private disputes, and coordinated the harassment of Plaintiffs.

**224.** Plaintiffs suffered damages as a direct result of Austria's racketeering activity.

### RICO PREDICATE ACTS

**MONEY LAUNDERING (18 U.S.C. § 1956) – Predicate Act under RICO (against all Defendants)**

**Legal Basis for Money Laundering**

**225.** Under **18 U.S.C. § 1956**, money laundering occurs when an individual or entity knowingly conducts or attempts to conduct a financial transaction involving the proceeds of unlawful activity with the intent to:

    a. Promote the carrying on of specified unlawful activity;

    b. Conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity; or

    c. Avoid a transaction reporting requirement under state or federal law.

    **226.** Under the statutory definition, money laundering includes receiving or transferring funds that are the proceeds of criminal activity, including violations of the Foreign Agents Registration Act (FARA) and the Foreign Corrupt Practices Act (FCPA), which are recognized as "specified unlawful activities" under 18 U.S.C. § 1956(c)(7).

**Application to FARA and FCPA Violations**

(a) FARA Violations as Unlawful Activity Under § 1956

- Under 22 U.S.C. § 612, FARA requires that individuals acting on behalf of a foreign government in political or quasi-political activities within the United States register with the U.S. Department of Justice (DOJ).

- Failure to register, concealment of the foreign influence, and financial transactions linked to these activities constitute criminal violations under FARA.

- Courts have held that funding and payments directed toward undisclosed foreign influence activities constitute specified unlawful activity under § 1956.

**227.** In this case:

- Defendant Austria, through its Ministry of Foreign Affairs and Austrian Embassy, paid Defendant Rolff for legal services and political influence without disclosing Rolff's status as a foreign agent under FARA.

- Defendant Rolff knowingly accepted funds while failing to register as a foreign agent, thereby engaging in criminal conduct under FARA.

- The funds transferred from the Austrian Ministry of Justice and the Austrian Ministry of the Interior to Rolff's IOLTA account, and then to Webner, are proceeds of FARA violations and constitute the laundering of criminal proceeds under 18 U.S.C. § 1956.

(b) FCPA Violations as Unlawful Activity Under § 1956

- The Foreign Corrupt Practices Act (FCPA) (15 U.S.C. §§ 78dd-1, et seq.) prohibits U.S. individuals and entities from offering, promising, authorizing, or making payments to foreign officials to influence business or secure an improper advantage.

- Austria's payments to Rolff and Webner involved proceeds from bribes and kickbacks made to Austrian officials in exchange for political and legal influence over Plaintiffs' litigation in the United States.

**228.** In this case:

- Defendant Austria, through its Ministry of Foreign Affairs and Austrian Embassy, used state funds to engage in bribery and influence operations in the U.S. by funding legal efforts to obstruct Plaintiffs' litigation and promote false pretenses regarding their criminal liability.

- Defendant Rolff used the proceeds of these bribes and kickbacks to engage in money laundering by depositing the funds into shell companies, fabricating invoices, and paying her co-conspirator Webner.

- These funds constitute proceeds of FCPA violations and qualify as proceeds of "specified unlawful activity" under § 1956.

**Structured Financial Transactions to Avoid Detection**

- Defendant Austria structured the payments to Rolff and Webner through shell companies and disguised them as legal fees for fictitious services (alleged legal representing of 15 Austrian officials sued in official capacities.)

- Defendant Rolff deposited these funds into her IOLTA account at Rolff Law P.A. and partially transferred them to Webner's IOLTA account to conceal their criminal origins.

- This conduct satisfies the statutory definition of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) — attempting to disguise the nature and source of unlawful proceeds.

**229.** Promotion of Unlawful Activity

- The laundered funds were used to:
  - Finance false affidavits and obstruction of court proceedings;
  - Fund defamatory campaigns and spread false information about Plaintiffs;
  - Influence court proceedings in the United States by pressuring Plaintiffs to drop their lawsuits;
  - Fund bribery and kickbacks to Austrian government officials.

**230.** Defendant Austria and its agents (Rolff and Webner) knowingly engaged in a pattern of money laundering by accepting and using the proceeds of FARA and FCPA violations to finance further criminal conduct under § 1956. **THEREFORE,** the payment of Austrian government funds to Rolff and Webner for undisclosed foreign influence activity (FARA) and to fund bribery and influence over U.S. litigation (FCPA) constitutes unlawful activity under § 1956. Austria's agents structured these payments to conceal their illegal nature, making them actionable money laundering predicate acts under RICO.

**MAIL FRAUD (18 U.S.C. § 1341) – Predicate Act under RICO (against all Defendants)**

**231.** Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

**232.** All Defendants, including the **Republic of Austria**, **Elke Rolff**, **Dale F. Webner**, and **John Doe(s)**, engaged in a coordinated scheme to defraud U.S. courts, U.S. agencies, and the Plaintiffs, in violation of **18 U.S.C. § 1341 – Mail Fraud**, a predicate act under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961(1).

**233.** Mail fraud under § 1341 occurs when a person, having devised or intending to devise a scheme to defraud, uses the U.S. mail or any private or commercial interstate carrier to execute or attempt to execute the scheme.

**Specific Elements of Mail Fraud Present**

**A. Scheme to Defraud**

**234.** Defendants devised and executed a fraudulent scheme involving:

- Fabricated affidavits filed in U.S. courts (e.g., ¶¶144–145);

- False and defamatory statements about Plaintiffs' alleged criminal activity (¶¶120, 144–146);

- Fictitious legal services invoiced by Rolff and Webner to the Austrian government (¶¶96–98, 127–132);

- Use of falsified "official" roles by Ms. Rolff to induce reliance and suppress Plaintiffs' legal rights (¶¶147–151);

- The misrepresentation that U.S. government agencies had cooperated in criminal investigations against Plaintiffs (¶¶166–170, 184).

**B. Use of the Mails in Furtherance of the Scheme**

**235.** The following mailings occurred in furtherance of this scheme:

- **December 2022**: The Austrian Ministry of Justice mailed Plaintiffs a fraudulent notice of new criminal investigations, which was completed in Russian and sent via DOJ and **FedEx**, a commercial carrier (¶111). This was used to support the false narrative that Plaintiffs were under investigation and to justify withholding their seized property.

- **October–April 2023**: Notarized and fabricated affidavits by Defendants Rabl and Hoflinger were **mailed and filed** by Mr. Webner in U.S. federal courts (¶¶144–145, 168), used to support false defenses in civil litigation and to defame the Plaintiffs.

- **November 9, 2023**: Defendant Webner **served** interrogatories executed under oath by Rolff (¶181), which were sent via **U.S. Mail or private courier**, and included knowingly false representations and admissions tied to the fraudulent RICO enterprise.

- **Multiple instances** of filing pleadings and case-related documents via court systems and certified mail or private carrier involving misrepresentations (¶¶120, 144, 168, 197–199).

## C. Intent to Defraud

**236.** Defendants intended to defraud Plaintiffs of:

   o  Their property (through fabricated criminal investigations);

   o  Their right to access U.S. courts (by presenting false narratives to judges);

   o  Their legal standing and reputation (through coordinated defamatory mailings);

   o  Their access to income and tax records by blocking property return through mailed pretense of investigation (¶¶113–116).

**237.** Defendants knew that the statements contained in their court filings and government communications were materially false and misleading.

**238.** The use of interstate mail and commercial carriers was essential to the success of the scheme and was repeatedly employed to give the appearance of legitimacy to false claims, obstruct justice, and continue the cover-up of the illegal seizure of Plaintiffs' property.

**Defendants' Roles in Mail Fraud**

- **Republic of Austria**: Caused and authorized the transmission of false notices to Plaintiffs via mail regarding sham investigations, orchestrated through the Ministry of Justice (¶¶111, 129).

- **Elke Rolff**: Participated in preparing fabricated documents and admissions that were mailed to Plaintiffs and filed in court; issued and mailed fraudulent invoices for legal services never rendered (¶¶96–98, 144–145, 181).

- **Dale Webner**: Drafted, mailed, and filed false affidavits and legal pleadings (¶¶120, 144–145, 168, 197); used the mails to serve fraudulent discovery and threats (¶181).

- **John Doe(s)**: Austrian officials who caused and coordinated mailings through the Embassy and Ministries to forward false and defamatory statements in U.S. proceedings (¶¶117–118, 129–132, 193–194).

**Conclusion**

**239.** As a direct and proximate result of the mail fraud conducted by Defendants:

- Plaintiffs were defamed and falsely accused of crimes;

- Plaintiffs' property remained unlawfully seized;

- Plaintiffs suffered economic damages, loss of employment opportunities, emotional distress, reputational harm, and legal costs.

**WIRE FRAUD (18 U.S.C. § 1343) – Predicate Act under RICO (Against All Defendants)**

**240.** Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

**241.** All Defendants — **Republic of Austria, Elke Rolff, Dale F. Webner,** and **John Doe(s)** — knowingly and willfully devised or participated in a scheme to defraud Plaintiffs and to obtain title on Plaintiffs' property through false pretenses and influence through materially false pretenses, representations, and promises.

**242.** In execution and furtherance of this fraudulent scheme, Defendants used wire communications transmitted in interstate and foreign commerce, including email, court e-filing systems, and wire transfers, in violation of **18 U.S.C. § 1343**.

**Elements of Wire Fraud and Their Fulfillment**

**A. Scheme to Defraud**

**243.** The fraudulent scheme included:

- o Defendants Rolff and Webner submitting knowingly false court filings containing fabricated facts and affidavits (¶¶144–145, 168, 181);

- Invoices for fictitious legal services created by Rolff and submitted to Austrian ministries (¶¶96–98, 127–132), despite her never appearing in court and having no retainer agreements (¶¶121, 134);

- The creation and circulation of fraudulent statements regarding criminal investigations to justify Austria's unlawful retention of Plaintiffs' property (¶¶111–116, 152–155);

- False claims that Plaintiffs were under active criminal investigation in the U.S. and Austria — disseminated through email and used to threaten deportation (¶¶166–170, 174–180);

- Coordinated misuse of government resources to obstruct Plaintiffs' access to justice in U.S. courts (¶¶117–119, 140–143, 173–176).

## B. Use of Wires in Interstate or Foreign Commerce

**244.** The scheme was executed using interstate and international wire communications, including:

- **Emails** between Ms. Rolff, Mr. Webner, and Austrian John Doe officials coordinating litigation strategies and dissemination of defamatory information (¶¶117–119, 181);

- **Electronic filings** of court documents by Webner containing fabricated affidavits and statements (¶¶145, 168, 197–199);

- **Electronic transmission of false invoices** by Rolff to Austrian government entities, followed by **international wire transfers** from the Austrian Ministry of Interior and Ministry of Justice to Rolff's IOLTA account (¶¶127–132);

- **Wire transfers** from Rolff to Webner for splitting fraudulent payments from the Austrian government (¶130);

- **Use of electronic platforms** (e.g., PACER, court e-filing systems) to file false documents and affidavits (¶¶168, 197);

- **Digital communications** with U.S. Secret Service to manipulate records and suppress evidence via email (¶¶190–194).

## C. Specific Falsehoods Transmitted by Wire

**245.** Examples of specific false representations transmitted electronically:

- Rolff's false claim of being an official Austrian government attorney authorized to negotiate on behalf of Austria (¶¶147–149);

- Webner's false statement that Plaintiffs were criminals under investigation by U.S. and Austrian authorities, intended to coerce Plaintiffs to withdraw their cases (¶¶174–175);

- o  Rolff's and Webner's fabrication of legal documents and interrogatories under oath that were electronically filed and served (¶181);

- o  Rolff's statement in interrogatories that she and Webner had personally seen a U.S. Secret Service report that does not exist (¶184), submitted via electronic discovery.

## 246. Defendants' Individual Roles in Wire Fraud

- **Republic of Austria**:

  - o  Directed, facilitated, and financed the scheme by wiring public funds for sham services into U.S. accounts (¶¶127–129);

  - o  Authorized communication of false narratives via its Embassy and Ministries (¶¶117–119, 193–194).

- **Elke Rolff**:

  - o  Sent false invoices via email and received wire transfers into her IOLTA account;

  - o  Transmitted false affidavits and interrogatory responses through email and court filings;

  - o  Coordinated electronically with Austrian John Doe(s) and Webner.

- **Dale F. Webner**:

- Filed false affidavits and other litigation documents electronically (¶¶144–145, 168, 197–199);

- Used email and virtual court meetings (e.g., Zoom) to threaten, intimidate, and coerce Plaintiffs (¶¶174–175);

- Participated in electronic planning and execution of the fraudulent scheme.

- **John Doe(s)**:

  - Austrian officials who communicated via email and coordinated false statements, invoice payments, and misinformation campaigns;

  - Arranged and participated in wire transfers of public funds to support the fraudulent scheme (¶¶127–133, 193–194).

**Conclusion**

**247.** As a direct and proximate result of the wire fraud committed by Defendants, Plaintiffs:

- Were deprived of access to their stolen property;

- Suffered reputational damage from coordinated defamation;

- Lost income and incurred substantial legal expenses due to manipulated proceedings;

- Experienced severe emotional distress and health consequences (¶¶177–178).

## OBSTRUCTION OF JUSTICE (18 U.S.C. § 1503) – Predicate Act under RICO (Against All Defendants)

**248.** Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

### Overview

**249.** Defendants Republic of Austria, Elke Rolff, Dale F. Webner, and John Doe(s) intentionally engaged in a scheme to obstruct justice in pending and ongoing proceedings in U.S. federal courts, including but not limited to:

- *Dvoinik v. Austria,*
- *Dvoinik v. Philipp,*
- *Dvoinik v. Rabl,* and
- *Zavadovsky v. Cheatle.*

**250.** The obstructive conduct included submitting false affidavits, threats and coercion aimed at Plaintiffs, tampering with court records, using intimidation to compel withdrawal of claims, and manipulating U.S. agency communications,

all in violation of **18 U.S.C. § 1503**, which prohibits any endeavor to influence, obstruct, or impede the due administration of justice.

**Defendants' Specific Conduct**

**A. Filing and Use of False Evidence in U.S. Federal Proceedings**

251. Rolff and Webner, in coordination with Republic of Austria and John Doe(s):

- o Filed false affidavits from Mario Rabl and Susanne Hoflinger asserting no contact with Florida or the U.S. (¶¶144–145, 168);
- o Submitted fabricated claims that investigations were conducted by the U.S. Secret Service, which were not (¶¶184, 169–170);
- o Used false notarized statements to defeat personal jurisdiction and discredit Plaintiffs' evidence (¶¶145, 168, 199).

252. The falsified affidavits and misrepresentations were intended to interfere with the truth-finding function of federal courts and to obstruct proceedings by misleading judges and preempting legitimate legal claims.

**B. Intimidation and Coercion to Interfere with Plaintiffs' Access to Courts**

**253.** In multiple documented instances, Defendants Rolff and Webner directly attempted to coerce Plaintiffs to withdraw their lawsuits through:

- o Threats of deportation, criminal prosecution, and retaliation by Austrian intelligence and U.S. agencies (¶¶140–141, 174–175);

- o Statements that "judges have no power here" and that Austria will influence outcomes through political means (¶180(g));

- o Claims that if Plaintiffs did not sign documents, the "judge will dismiss the case next week" (¶180(n)).

**254.** These threats were made during official court proceedings, including Zoom Rule 26(f) conferences and personal meetings (¶¶174–175, 179–180), thereby directly interfering with the administration of justice and chilling Plaintiffs' participation.

## C. Fabrication and Misuse of Court Documents

**255.** Defendants Webner and Rolff, in coordination with Austrian John Doe(s):

- o Filed false interrogatories under oath (¶181);

- o Used falsified allegations from Austria to justify continued proceedings against Plaintiffs (¶¶170–172, 184);

    o   Filed confidential Plaintiff emails (illegally obtained from U.S. Secret Service FOIA requests) into the public docket (¶¶196–197), intending to discredit and intimidate Plaintiffs.

## D. Interference with Evidence and Withholding of Documents

256. Despite knowledge of Plaintiffs' need for their educational, tax, and medical records to prove claims and avoid harm, Republic of Austria and its agents:

    o   Refused to return documents and property unrelated to ongoing proceedings (¶¶112–116);

    o   Deliberately withheld key evidence necessary to litigate (e.g., Libson archive, CMR certificates, tax documentation).

257. These actions hindered Plaintiffs' ability to prosecute or defend legal claims, obstructing justice within the meaning of § 1503.

## E. Manipulation of U.S. Agency Responses

258. Austrian John Doe(s), with knowledge of legal proceedings, made false statements to the U.S. Secret Service, including that:

- Plaintiffs were under investigation in Austria (¶193);

- Requests for information should be blocked under the ongoing investigation FOIA exception.

**259.** Upon information and belief, Austrian officials bribed or improperly influenced a Secret Service FOIA officer to change the agency's position and release confidential email correspondence unlawfully (¶¶194–196).

## Intent and Culpability

**260.** All Defendants acted knowingly and willfully with the intent to:

- Obstruct and impede the due administration of justice;
- Suppress Plaintiffs' legal rights;
- Dissuade Plaintiffs from pursuing federal remedies;
- Mislead courts through false evidence and fraudulent filings.

**261.** Defendants' pattern of conduct constitutes obstruction of justice under **18 U.S.C. § 1503** and serves as a **RICO predicate act** under **18 U.S.C. § 1961(1)(B)**.

## Injury

**262.** As a direct result of Defendants' obstruction, Plaintiffs suffered:

- Suppression of critical evidence;
- Delay or dismissal of claims;

- Psychological trauma, and reputational damage;
- Financial harm due to lost property and legal expenses.

## EXTORTION (18 U.S.C. § 1951) – Predicate Act under RICO (Against All Defendants)

**263.** Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

### Statutory Basis

**264.** Under 18 U.S.C. § 1951 (the "Hobbs Act"), it is unlawful to obstruct, delay, or affect commerce by extortion, which is defined as obtaining property from another, with his consent, induced by the wrongful use of actual or threatened force, violence, or fear, or under color of official right.

**265.** Defendants' acts of coercion, threats, and abuse of state power to compel the Plaintiffs to abandon their property rights and lawsuits amount to extortion affecting interstate and international commerce and constitute a predicate act under 18 U.S.C. § 1961(1)(B).

### A. Extortion by Threats of Deportation, Prosecution, and Retaliation

**266.** Defendants Dale F. Webner and Elke Rolff, acting on behalf of the Republic of Austria and in coordination with John Doe(s) from the Austrian Embassy and Ministries:

- o Threatened Plaintiffs that unless they withdrew their lawsuits (including *Dvoinik v. Austria* and *Dvoinik v. Philipp*), they would be deported, criminally prosecuted in Austria, or targeted by Austrian and U.S. intelligence services (¶¶140–141, 175).

**267.** Mr. Webner explicitly stated:

- o "You [Plaintiffs] cannot fight against a European country. If Austria retains me, I will delay all legal processes through appeals, leaving you with no result." (¶141)
- o "If you do not voluntarily provide me with copies of all your immigration documents and passports, your deportation from the States will occur quite soon." (¶180(q))
- o "We will seek your extradition." (¶180(r))

**268.** These threats were intended to create fear of serious harm or governmental retaliation in order to:

- o Force Plaintiffs to abandon their lawsuits;

- o   Suppress claims relating to stolen property, defamation, and RICO violations;

- o   Undermine Plaintiffs' access to the courts and lawful remedies.

## B. Extortionate Demand for Withholding of Property

**269.** Republic of Austria, through its Ministries and prosecutors, and its U.S.-based agents (Rolff and John Doe(s)), extorted Plaintiffs by:

- o   Refusing to return valuable property lawfully owned by Plaintiffs, including:

  - ▪   The Libson archive and antique coins,

  - ▪   Educational and tax records,

  - ▪   Medical records,

  - ▪   Business documents,

- o   While demanding cooperation with Austria's fabricated legal narrative and abandonment of U.S. lawsuits (¶¶112–116, 151–156).

**270.** Ms. Rolff explicitly conditioned the return of property on Plaintiffs providing "proof of lawful connection" to the archive (¶156), and cooperating with Austrian officials (¶¶157–160).

**271.** The withholding of essential property and documentation interfered with Plaintiffs' ability to work, respond to audits, and maintain their livelihood was used as leverage to extract compliance and silence under the color of official right.

## C. Extortion by Threatening Legal and Economic Harm

In meetings and court conferences, **Webner and Rolff** told Plaintiffs:

- "Judges have no power here." (¶180(g))
- "The Austrian Embassy will solve all problems with judges." (¶180(f))
- "You must sign the documents I prepared, or the judge will dismiss the case next week." (¶180(m)-(n))

**272.** These threats were made to coerce Plaintiffs into abandoning legal claims, and falsely implied governmental power or influence over the judiciary, clearly invoking fear of legal, political, and economic harm.

## D. Extortion Affecting Commerce

**273.** The extortionate acts impacted commerce by:

- Delaying and suppressing federal court litigation;
- Causing the Plaintiffs over **$800,000 in pecuniary losses** (¶163);

- Causing interruption of professional activity, foreclosure, and seizure of pension income (¶¶152–154).

**274.** Defendants' actions, carried out under the guise of legal proceedings and diplomatic channels, used **the authority of the Austrian state** and U.S. courts as instruments of coercion, in violation of the Hobbs Act.

## Conclusion

**275.** The pattern of extortion, including threats, withholding of property, and coercive demands, constitutes a predicate act under 18 U.S.C. § 1951, committed as part of a coordinated scheme to obstruct Plaintiffs' legal rights and benefit Austria and its agents.

**276.** Plaintiffs suffered economic injury, loss of property, and emotional distress directly resulting from Defendants' extortionate conduct.

## COUNT II– RICO CONSPIRACY (18 U.S.C. § 1962(d))

**(Against Defendants Republic of Austria, Elke Rolff, Dale Webner, and John Doe(s))**

**Plaintiffs ELENA DVOINIK and BORIS ZAVADOVSKY** incorporate by reference all preceding paragraphs of the complaint as if fully set forth herein.

**A. Legal Standard – RICO Conspiracy (§ 1962(d))**

**277.** Under 18 U.S.C. § 1962(d), it is unlawful for any person to conspire to violate any provision of 18 U.S.C. § 1962(c).

**278.** A RICO conspiracy claim requires:

- o   Agreement between two or more persons;
- o   To conduct or participate in the affairs of an enterprise;
- o   Through a pattern of racketeering activity.

**279.** The conspirators need not commit each predicate act personally, but they must knowingly agree to facilitate the enterprise's criminal objectives. (*Salinas v. United States*, 522 U.S. 52, 63-65 (1997)).

**B. Existence of the RICO Enterprise**

**280.** The "RICO enterprise" is comprised of the Republic of Austria (through its Ministries of Justice, Interior, and Foreign Affairs), the Austrian Embassy in Washington D.C., private attorneys Elke Rolff and Dale Webner, and unnamed Austrian officials and diplomats (John Doe(s)) (¶92–101, ¶117–119, ¶127–131, ¶182).

**281.** The enterprise is distinct from its members and operated through a coordinated scheme to:

- o  Conceal the unlawful seizure of Plaintiffs' property;

- o  Launder Austrian budget funds under the pretext of fictitious legal services;

- o  Intimidate and silence Plaintiffs through defamation, threats, and abuse of process;

- o  Obstruct judicial proceedings in the United States.

## C. Conspiratorial Agreement and Acts

282. Defendant Republic of Austria, through John Doe(s), hired Ms. Rolff as a "trusted lawyer" (¶92–93) and conspired to launder government funds via false invoices and shell entities under the pretense of litigation defense (¶96–99, ¶127–133).

283. Defendant Elke Rolff:

- o  Created false invoices for legal work never performed (¶97, ¶131);

- o  Acted on instructions from John Doe(s) to initiate misleading filings in U.S. courts (¶118–119, ¶182–183);

- o  Conspired with Webner to fabricate affidavits and court documents (¶144–146, ¶165–168);

o Participated in efforts to extort Plaintiffs via false legal claims and threats (¶151–157).

**284.** Defendant Dale Webner:

o Knowingly submitted false affidavits to federal courts on behalf of Austrian officials (¶145–148);

o Threatened Plaintiffs with deportation, prosecution, and retaliation unless they dropped lawsuits (¶175–180);

o Claimed to have viewed classified U.S. law enforcement records fabricated or unlawfully obtained via Austria's conspiracy (¶184–200);

o Was paid through Rolff's IOLTA account using Austrian budget funds for fictitious services (¶130, ¶132).

**285.** Defendant John Doe(s) orchestrated and coordinated the entire scheme:

o Directed Rolff and Webner's litigation strategy (¶117–119, ¶182–183);

o Disseminated false information to U.S. agencies, including the Secret Service, to disrupt FOIA requests and shield co-conspirators (¶193–196);

      o  Participated in money laundering by authorizing payments for sham legal work (¶127–133).

## D. Pattern of Racketeering Activity

**286.** The predicate acts committed or facilitated by the conspiracy include:

- **Wire fraud (18 U.S.C. § 1343)** – Sending false invoices and court filings electronically (¶97–99, ¶144–146);

- **Mail fraud (18 U.S.C. § 1341)** – Sending fabricated affidavits and case-related materials via FedEx and U.S. mail (¶111–113, ¶168);

- **Extortion (18 U.S.C. § 1951)** – Threatening Plaintiffs with imprisonment, prosecution, and deportation to force dismissal of U.S. suits (¶175–180);

- **Obstruction of justice (18 U.S.C. § 1503)** – Falsely influencing federal court proceedings, falsifying affidavits, and misrepresenting Plaintiffs to U.S. agencies (¶168–170, ¶197–199);

- **Money laundering (18 U.S.C. §§ 1956, 1957)** – Creating shell companies and laundering funds for services violating FARA and FCPA (¶96–99, ¶130–133).

## E. Resulting Harm

**287.** Plaintiffs suffered direct injuries as a result of this conspiracy, including:

- Permanent loss of property valued over $5.6 million;

- Severe emotional distress and medical harm (¶178);

- Reputational and legal damage through defamatory filings and false accusations;

- Sanctions from German tax authorities and foreclosure proceedings (¶163).


## COUNT III– CONVERSION UNDER D.C. COMMON LAW

**(Against Defendants Republic of Austria, Elke Rolff, Dale Webner, and John Doe(s))**

**288.** Plaintiffs ELENA DVOINIK and BORIS ZAVADOVSKY incorporate by reference all preceding paragraphs as if fully set forth herein.

### A. Legal Standard (Conversion under D.C. Law)

**289.** Under District of Columbia common law, conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights." (*Washington Gas Light Co. v. Pub. Serv.* Comm'n, 61 A.3d 662, 675–76 (D.C. 2013)).

**290.** To state a claim for conversion, a plaintiff must show:

- o  Ownership or right to possess the property;

- o  Defendant's wrongful act or disposition of plaintiff's property rights;

- o  Resulting damages.

## B. Conversion by the Republic of Austria

**291.** Plaintiffs lawfully owned and possessed highly valuable personal property stored at their home at Zuckerhut-Siedlung 3A, Gloggnitz, Austria, including:

- o  Personal documents (passports, tax and business records);

- o  Medical records;

- o  Educational certifications;

- o  Vladimir Libson's professional architectural archive (Plaintiff Zavadovsky's father);

- o  Antique coin collection valued at approximately $5.6 million (¶114, ¶153).

**292.** On July 12, 2021, without a valid warrant or legal justification, Austrian law enforcement, including Officer Mario Rabl, former officer Susanne Hoflinger, and others, acting under the direction of the Austrian Ministry of Interior, conducted a raid on Plaintiffs' home and seized all such property (¶113–114).

**293.** The Defendant Republic of Austria, through its ministries and agents, retained this property without legal cause, even after the formal closure of investigations (¶112), violating both Austrian and international due process standards.

**294.** Plaintiffs made repeated written and verbal demands for the return of their property, but Austria refused to investigate or return the items (¶115–116, ¶186).

**295.** These actions constitute intentional interference with Plaintiffs' property rights, satisfying the elements of conversion under D.C. law.

## C. Conversion Involving Defendant Elke Rolff

**296.** Defendant Elke Rolff, acting as an unregistered foreign agent and counsel for Austria, made explicit promises to Plaintiffs that she would help resolve the seizure of their property and coordinate the return of documents and valuable archives (¶147–158).

**297.** Plaintiffs relied on Rolff's promises and incurred substantial costs to obtain and transmit records to her (¶159–162), but Rolff failed to act or respond, thereby interfering with the property for which she accepted responsibility.

**298.** Rolff actively misrepresented her authority and engaged in fraudulent pretense to take possession or control over the property and its documentation, and thus is liable for conversion.

## D. Conversion Involving Defendant Dale Webner

**299.** Defendant Dale Webner, as a co-conspirator with Austria and Rolff, knowingly filed documents based on fraudulently obtained information about the Plaintiffs' property, including court filings related to the seized property (¶144–145, ¶168, ¶197).

**300.** Webner used false statements and intimidation to suppress Plaintiffs' ability to recover their own property, and at various times acted to obscure the status and location of this property (¶176, ¶179–180).

**301.** Webner's active role in suppressing rightful ownership and use of Plaintiffs' property meets the threshold of aiding and abetting conversion under D.C. law.

## E. Conversion by Defendants John Doe(s)

**302.** Unknown officials from Austria, referred to as John Doe(s), were responsible for facilitating Austria's refusal to return the Plaintiffs' property by:

- Transferring falsified claims to U.S. agencies (¶193);

- Creating false claims of pending litigation as a pretext for retention (¶118);

- Coordinating with Rolff and Webner to conceal the unlawful nature of the seizure and continued conversion (¶127–128, ¶144–145).

**303.** These intentional acts deprived Plaintiffs of their rightful ownership and the ability to use or benefit from their property, thereby constituting actionable conversion.

## F. Damages

**304.** As a result of the conversion of their property by all named Defendants:

- Plaintiffs lost access to critical medical, legal, tax, and professional documents;

- Plaintiff Zavadovsky was subjected to IRS penalties and pension seizure due to missing tax documents (¶163);

- Plaintiffs lost real estate and professional opportunities;

- Plaintiffs lost access to valuable property with an estimated market value exceeding $6,000,000;

- Plaintiffs suffered emotional distress and reputational harm from being falsely accused of fraud related to this property (¶120, ¶166–167).

## COUNT IV – DEFAMATION UNDER D.C. COMMON LAW

**(Against Defendants Republic of Austria, Elke Rolff, Dale Webner, and John Doe(s))**

305. Plaintiffs ELENA DVOINIK and BORIS ZAVADOVSKY incorporate by reference all preceding paragraphs as if fully set forth herein.

### A. Applicable Law – Defamation in the District of Columbia

306. Under District of Columbia law, a defamation claim requires:

a. A false and defamatory statement concerning the plaintiff;

b. Publication of that statement to a third party without privilege;

c. Fault amounting to at least negligence; and

d. Either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. See *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005); *Crowley v. N. Am. Telecomm. Ass'n*, 691 A.2d 1169, 1173 (D.C. 1997).

**Defamation per se** under D.C. law includes statements that:

- o   Impugn one's integrity in their profession;
- o   Accuse someone of criminal conduct;
- o   Allege fraud or dishonesty;
- o   Expose someone to public scorn or contempt.

**B. Defamatory Statements by the Republic of Austria and John Doe(s)**

307. Officials from the **Austrian Ministry of Foreign Affairs**, **Austrian Ministry of Justice**, and the **Austrian Embassy in Washington, D.C.**, acting as agents of the **Republic of Austria**, made **false and defamatory statements** to third parties, including:

- o The U.S. Secret Service (¶193),
- o German law enforcement (¶120),
- o Russian law enforcement (¶120),
- o U.S. federal courts (¶189, ¶197).

308. These statements falsely asserted that Plaintiffs:

- o Were the subject of active criminal investigations;
- o Had falsified U.S. medical invoices and identification documents;
- o Were involved in insurance fraud and document forgery;
- o Were illegal immigrants who falsified their identities (¶¶118, 173, 193).

309. These statements were knowingly false or made with reckless disregard for the truth, as no such investigations or findings existed at the time of the publications (¶¶111, 171–172).

**310.** These statements were published in Nota Verbale, court pleadings, emails to U.S. agencies, and orally by Austria's agents, causing serious harm to the Plaintiffs' reputations and exposing them to suspicion and governmental scrutiny.

## C. Defamatory Conduct of Elke Rolff

**311.** Defendant **Elke Rolff**, a Florida attorney and unregistered foreign agent of Austria, made and published false statements in written interrogatories and sworn court filings (¶181), including:

- That the U.S. Secret Service had conducted and completed criminal investigations into Plaintiffs;
- That Plaintiffs were subject to criminal prosecutions in Austria related to fraud and document falsification;
- That Plaintiffs fabricated receipts from U.S. Army doctors, NYU, and a Miami optometrist (¶111, ¶184).

**312.** Rolff also **coordinated the submission of false affidavits** from other Austrian defendants, repeating these defamatory allegations in litigation pending in the U.S. (¶¶144–145, 166–168).

**313.** Rolff's statements impugned Plaintiffs' honesty and accused them of crimes and immigration fraud, making them **defamatory per se** under D.C. law.

## D. Defamatory Conduct of Dale F. Webner

**314.** Defendant **Dale F. Webner**, an attorney licensed in Florida, **published false, derogatory, and malicious statements** about the Plaintiffs in federal court pleadings and during a Rule 26(f) conference on May 12, 2023 (¶175), including:

- Accusing Plaintiffs of being "criminals," "liars," and "illegal immigrants";
- Claiming they were under investigation by U.S. and Austrian intelligence;
- Alleging that they had fabricated medical and insurance documents.

**315.** Webner further threatened to seek Plaintiffs' **extradition and deportation**, falsely claiming that U.S. authorities were pursuing active investigations at Austria's request (¶¶175–176, 180).

**316.** These statements were knowingly false and designed to **intimidate, coerce, and discredit** the Plaintiffs in active litigation, satisfying the malice element of defamation.

## E. Defamatory Publications by John Doe(s)

**317.** Unknown officials from Austria ("John Doe(s)**"**) coordinated with Rolff and Webner to create and disseminate false affidavits**,** fabricate statements to U.S. agencies (¶193), and misrepresent Plaintiffs' character in pleadings filed in federal court (¶¶144–145, 168, 197–198).

**318.** John Doe(s) knew the statements were false, and their actions were not privileged or protected under FSIA, as they were part of a commercial scheme involving foreign agents and coordinated defamatory efforts in the U.S.

## F. Harm to Plaintiffs

**319.** As a direct and proximate result of Defendants' defamatory statements, Plaintiffs:

- Suffered reputational injury;
- Experienced severe emotional distress;
- Lost business opportunities and standing in their professional and personal communities;
- Were wrongfully subjected to suspicion and surveillance by law enforcement.

## COUNT V– INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

**(Against Defendants Republic of Austria, Elke Rolff, Dale Webner, and John Doe(s))**

**320.** Plaintiffs ELENA DVOINIK and BORIS ZAVADOVSKY incorporate by reference all preceding paragraphs as if fully set forth herein.

## A. Legal Standard for IIED (D.C. Common Law)

**321.** Under D.C. law, to state a claim for intentional infliction of emotional distress, a plaintiff must plead:

- o Extreme and outrageous conduct by the defendant;

- o Intentional or reckless infliction of emotional distress; and

- o Resulting severe emotional distress.

  (*Abourezk v. New York Airlines, Inc.*, 895 F.2d 1456 (D.C. Cir. 1990);

  *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984)).

**322.** The conduct must go "beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community." (Restatement (Second) of Torts § 46).

## B. Defendant Republic of Austria

**323.** The Republic of Austria, through its ministries and agents (including prosecutors and embassy staff), engaged in a targeted campaign of harassment, threats, and malicious prosecution against Plaintiffs:

- o Refusing to return Plaintiffs' lawfully owned property, including vital medical and tax records, after closure of criminal investigations (¶112–114);

- o  Initiating a second baseless criminal investigation based on false testimony from Mario Rabl, despite knowing the first investigation was terminated (¶111–113, ¶171);

- o  Failing to respond to repeated requests, leading to tax sanctions, foreclosure, and destruction of Plaintiffs' professional lives (¶114–116, ¶163).

`**324.** Austria acted with reckless disregard for Plaintiffs' rights and the foreseeable emotional harm caused by those acts.

## C. Defendant Elke Rolff

**325.** Rolff pretended to be a government liaison and agent for Austria, promised to help resolve issues, and demanded evidence (¶147–158).

**326.** Rolff knowingly misled Plaintiffs into gathering and transmitting evidence from abroad, only to abandon them without explanation (¶161–162), which resulted in devastating financial and legal consequences (¶163).

**327.** Rolff exploited Plaintiffs' vulnerabilities, including fear of Austrian persecution, and engaged in a pattern of deceitful and intimidating behavior that intentionally caused emotional distress (¶147–156, ¶178–180).

## D. Defendant Dale Webner

**328**. Webner made extremely offensive and threatening statements to the Plaintiffs in a recorded legal proceeding (¶175), including:

- ○ False claims that U.S. intelligence and Austrian agencies were investigating them;

- ○ Statements that they were "criminals," "liars," and "delusional";

- ○ Threats of deportation, extradition, and sanctions if they did not drop their lawsuit (¶175, ¶180).

**329.** These intentional threats and insults, made while acting as an attorney for Austria, were designed to harass and emotionally destabilize the Plaintiffs.

**330.** As a result, Plaintiff Boris Zavadovsky, a 72-year-old retired U.S. Army physician, suffered an atrial fibrillation attack and required heart surgery due to stress (¶178), evidencing the severity of emotional and physical harm.

**E. Defendants John Doe(s)**

**331.** Austrian John Doe(s) — senior government officials and embassy personnel — orchestrated an international campaign of intimidation and emotional abuse by:

- Directing and funding Rolff and Webner;

- Fabricating affidavits (¶144–145, ¶165–167);

- Making false statements to U.S. Secret Service (¶193–195);

- Disclosing confidential emails and interfering with FOIA requests (¶196–197);

- Harassing Plaintiffs with fabricated claims of "ongoing criminal investigations" to justify retention of property and reputation harm (¶193–199).

**332.** John Doe(s) acted intentionally to emotionally and reputationally harm Plaintiffs, in retaliation for Plaintiffs' prior litigation and complaints.

## F. Damages

**333.** As a direct result of Defendants' conduct, Plaintiffs suffered:

- Mental anguish, anxiety, and reputational humiliation;

- Physical illness (atrial fibrillation and heart surgery for Mr. Zavadovsky);

- Ongoing fear of surveillance, false prosecution, and persecution by Austrian and U.S. authorities;

- Emotional exhaustion from prolonged legal obstruction and deceit.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs **ELENA DVOINIK** and **BORIS ZAVADOVSKY** respectfully request that this Court enter judgment in their favor and against all Defendants, jointly and severally, and award the following relief:

1. **Compensatory Damages** in an amount exceeding **$6,000,000**, representing the market value of the Plaintiffs' converted property, including:
   - The **Vladimir Libson archive**;
   - **Antique coin collection**;
   - **Tax-relevant documents**, **military certifications**, **medical records**, **educational records**, and other irreplaceable items.

2. **Conversion of Ms. Dvoinik's Business Archive**: An award of **$500,000** for the unlawful seizure and non-return of **Ms. Dvoinik's business archive**, which constituted active commercial property and caused substantial financial and professional harm.

3. **Loss of Income and Pension**: An award of damages exceeding **$50,000** to compensate **Dr. Zavadovsky** for the **loss of his German pension**, which was unlawfully suspended due to the Austrian government's failure to return key tax-related and official documentation.

4. **Additional Pecuniary Damages** exceeding **$1,800,000**, including:
   - Fines and sanctions from the **German tax authorities**;
   - **Foreclosure** and forced liquidation of Austrian real estate;

- o   Interference with U.S. professional licensing and contracts;

- o   Delay and obstruction of employment due to missing certifications.

5. **Medical Expenses and Personal Injury**: An award of **$128,000** to **Dr. Zavadovsky** for:

- o   Emergency **heart surgery** following stress-induced **atrial fibrillation** caused by Defendants' threats and intimidation;

- o   Related injuries and treatment.

6. **Non-Economic Damages**, in an amount to be determined at trial, for:

- o   **Severe emotional distress**, humiliation, psychological trauma, and anguish;

- o   Fear of persecution, reputational damage, and loss of quality of life.

7. **Treble Damages** pursuant to **18 U.S.C. § 1964(c)** for violations of RICO statutes (18 U.S.C. §§ 1962(c) and 1962(d)).

8. **Punitive Damages** (excluding against the Republic of Austria, per FSIA) against all other Defendants for malicious, fraudulent, and outrageous conduct.

9. **Declaratory Judgment** that:

- o   The Republic of Austria's conduct constitutes **commercial activity** under **28 U.S.C. § 1605(a)(2)**;

- o   Austria is **not entitled to sovereign immunity** under the FSIA;

- o Austria and its agents violated U.S. laws, including **FARA** and **FCPA**, and operated outside the scope of their governmental authority.

10. **Permanent Injunctive Relief**, enjoining Defendants from:

- o Continuing any retaliatory, defamatory, or harassing conduct;
- o Using unregistered foreign agents or fabricated evidence in U.S. proceedings.

11. **Restitution and Return of Property**, including:

- o All unlawfully seized personal, business, and legal documents;
- o Archives, valuables, and original records.

12. **Costs of Suit**, including:

- o Reasonable **attorneys' fees**;
- o **Expert witness costs**;
- o All other litigation expenses under 18 U.S.C. § 1964(c) and applicable law.

13. **Such other and further relief** as this Court deems just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: March 25, 2025

Respectfully submitted,

ELENA DVOINIK, Pro Se

BORIS ZAVADOVSKY, Pro Se

1413 Crescent Hills Dr., Tallahassee, Fl, 32303

Elena.dvoinik@yahoo.com

(347)671-57-53

## **VERIFICATION**

### **VERIFICATION 1**

Pursuant to 28 U.S.C. §1746, I, BORIS ZAVADOVSKY, declare under penalty of perjury, that I have personal knowledge contained in paragraphs of the Complaint and that the allegations contained therein are true and accurate.

Executed on March 25, 2025.

BORIS ZAVADOVSKY_____

### **VERIFICATION 2**

Pursuant to 28 U.S.C. §1746, I, ELENA DVOINIK, declare under penalty of perjury, that I have personal knowledge contained in paragraphs of the Complaint and that the allegations contained therein are true and accurate.

Executed on March 25, 2025.

ELENA DVOINIK_____

Elena Dvoinik
Boris Zavadovsky
1413 CRESCENT HILLS DR,
Tallahassee, FL, 32303
Telephone: (347)671-57-53
Elena.dvoinik@yahoo.com